1
2
3
4
5
6

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (SBN 175783)
 fbottini@bottinilaw.com
Albert Y. Chang (SBN 296065)
 achang@bottinilaw.com
Anne Beste (SBN 326881)
 abeste@bottinilaw.com
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:    (858) 914-2001
Facsimile:     (858) 914-2002

7
8

*Attorneys for Plaintiff*

9
10
11

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

12
13
14

SAL TORONTO, TRUSTEE OF THE
ELLIEMARIA TORONTO ESA, derivatively
on behalf of PINTEREST, INC.,

Case No. _____

15

                                        Plaintiff,

**VERIFIED SHAREHOLDER**
**DERIVATIVE COMPLAINT FOR:**

16

          vs.

**1. BREACH OF FIDUCIARY DUTY;**

17
18
19
20

BENJAMIN SILBERMANN, EVAN SHARP,
TODD MORGENFELD, JEREMY LEVINE,
JEFFREY JORDAN, GOKUL RAJARAM,
FREDRIC REYNOLDS, LESLIE KILGORE,
MICHELLE WILSON, and DOES 1–30,

**2. AIDING AND ABETTING**
**BREACH OF FIDUCIARY DUTY;**
**3. ABUSE OF CONTROL;**
**4. UNJUST ENRICHMENT; AND**
**5. VIOLATION OF SECTION 14(A)**
**OF THE SECURITIES**
**EXCHANGE ACT OF 1934.**

                                      Defendants,

21

          – and –

**DEMAND FOR JURY TRIAL**

22

PINTEREST, INC.,

23

                    Nominal Defendant.

24
25
26
27
28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## Table of Contents

I.      INTRODUCTION AND SUMMARY OF THE ACTION ............................................1

II.     JURISDICTION AND VENUE ................................................................................5

III.    INTRADISTRICT ASSIGNMENT ...........................................................................6

IV.     THE PARTIES .........................................................................................................7

        A.      Plaintiff ........................................................................................................7

        B.      Nominal Defendant ......................................................................................7

        C.      Officer Defendants .......................................................................................7

        D.      Director Defendants .....................................................................................8

        E.      Doe Defendants ...........................................................................................9

        F.      Unnamed Participants ..................................................................................9

V.      RESPONSIBILITIES AND DUTIES OF THE INDIVIDUAL DEFENDANTS........10

        A.      Responsibilities of the Individual Defendants.............................................10

        B.      Fiduciary Duties of the Individual Defendants.............................................11

        C.      Breaches of Fiduciary Duties by the Individual Defendants.......................12

        D.      Conspiracy, Aiding and Abetting, and Concerted Action............................13

VI.     SUBSTANTIVE ALLEGATIONS.............................................................................14

        A.      Pinterest Refuses to Publish a Pay Equity Report, Therefore Hiding
                Disparity in Pay from Public Scrutiny ..........................................................21

        B.      At All Relevant Times, the Individual Defendants Have Had Actual
                Knowledge that Pinterest Has Failed to Comply with Its Own
                Policies of Promoting Diversity and Prohibiting Discrimination,
                Yet the Individual Defendants Have Continued to Refuse to Take
                Action............................................................................................................25

C. Before Brougher Filed Her Gender Discrimination Lawsuit, Two Other Female Employees Reported Gender Discrimination at Pinterest But Their Complaints Were Disregarded by the Individual Defendants .................................................................................34

D. Pinterest's Compensation Committee Breached Its Duties by Awarding Large Equity Grants that Were Not Tethered in Any Way to Executives' Compliance with Laws Prohibiting Discrimination.............52

E. False and Misleading Statements Made by the Director Defendants in Pinterest's 2020 Proxy Statement .................................................58

F. The Directors' Roles and Committees at Pinterest.........................................64

G. The Director Defendants Breached Their Duties of Loyalty and Good Faith by Failing to Take Action in Response to the Rampant Reports of Gender and Ethnic Discrimination at the Company .................65

H. The Unjust Compensation Awarded to the Individual Defendants ...........65

VII. THE COMPANY HAS SUFFERED SIGNIFICANT DAMAGES ...........................67

VIII. DEMAND FUTILITY...................................................................................68

A. Demand Is Futile Against Silbermann and Sharp.........................................69

B. Demand Is Excused Because a Majority of the Director Defendants Is Either Not Independent or Is Conflicted Because the Directors Face a Substantial Likelihood of Liability Arising From Their Misconduct.........................................................................................70

C. The Entire Board Faces a Substantial Likelihood of Liability for Failure to Discharge Their Oversight Obligations in Good Faith...............72

D. Demand is Futile as to the Members of the Compensation Committee and Other Directors Who Approved Lower Compensation to Women .........................................................................73

IX. CAUSES OF ACTION ...............................................................................74

X. PRAYER FOR RELIEF ...............................................................................78

Plaintiff Sal Toronto, Trustee of the Elliemaria Toronto ESA ("Plaintiff") submits this Verified Shareholder Derivative Complaint against certain directors and officers of nominal defendant Pinterest, Inc. ("Pinterest" or the "Company") for, *inter alia*, violations of the Securities Exchange Act of 1934 ("Exchange Act"), breaches of fiduciary duties, aiding and abetting breach of fiduciary duty, abuse of control, and unjust enrichment.  In support of these claims, Plaintiff alleges the following upon (1) personal knowledge with respect to the matters pertaining to himself; and (2) information and belief with respect to all other matters, based upon the investigation undertaken by counsel, which included the propounding of a shareholder inspection demand and the receipt and review of documents produced by Pinterest in response to such demand,  a review of Pinterest's legal and regulatory filings, press releases, analyst reports, and media reports about the Company.   Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## I.     INTRODUCTION AND SUMMARY OF THE ACTION

"It's hard to feel inspired when you don't feel represented — online or in your workplace — and research shows that diverse teams make us more creative, diligent and hard working. When we are building products, a team of people with different backgrounds enables us to think through products, policies, and safety from all angles (for instance, how products could be abused or how they could unintentionally impact a community)."[1]

1.     Despite its supposed commitment to building a diverse team and prohibiting all forms of discrimination, Pinterest's top executives and members of its Board of Directors ("Board") have facilitated or knowingly ignored discrimination based on race and gender.

---

[1] *See* https://newsroom.pinterest.com/en/post/diversity-report-2020, last visited Dec. 11, 2020.

2.      Pinterest's Code of Conduct states:

We prohibit unlawful discrimination based on race, color, ethnicity, national origin, religion, sex (including pregnancy, childbirth, or related medical conditions), sexual orientation, gender, gender identity, gender expression, age, marital status, status as a protected veteran, physical or mental disability, medical condition, genetic information or characteristics (or those of a family member), or any other consideration made unlawful by applicable federal, state, or local laws. Discrimination based on a perception that anyone has any of those characteristics, or is associated with a person who has or is perceived as having any of those characteristics, is also prohibited.

3.      Despite claiming that it has strong and effective policies to prevent discrimination, complaints of gender and ethnic discrimination have proliferated at Pinterest damaging the Company's goodwill and brand.   As recent events have demonstrated, Pinterest's Directors have made misrepresentations in the Company's public statements by claiming to have a multitude of policies, internal controls, and processes designed to prevent discrimination at the Company.

4.      Moreover, Pinterest's Board of Directors has failed to promote diversity at the Company.  Less than 1% of the Company's senior executives are African American and there is not adequate representation of other historically underrepresented minorities at Pinterest.

5.      In the summer of 2020, three female senior executives at Pinterest, two of whom are Black women, exposed the falsity of the Company's claimed intolerance for discrimination.

6.      On August 11, 2020, Pinterest's former Chief Operating Officer ("COO") Francoise Brougher ("Brougher") filed a lawsuit against Pinterest alleging that she was discriminated against based on her sex.  Brougher alleged in her lawsuit that "Although

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Pinterest markets itself to women looking for inspiration, the company brazenly fired its top female executive [Brougher] for pointing out gender bias within Pinterest's male-dominated leadership team."[2]

7.     Ms. Brougher alleges that Pinterest's CFO — Defendant Todd Morgenfeld — "made demeaning sexist comments to her" and that she "was offered a less favorable compensation structure than her male peers and had to fight for equal treatment."

8.     On Friday, August 14, 2020, 236 employees of Pinterest expressed support for Brougher and the two other employees who have accused the company of racial and sex discrimination and retaliation.  Many of the employees also shared and signed an online petition calling on Ben Silbermann, Pinterest's chief executive and co-founder, to change the Company's policies.  Then they staged a virtual walkout.[3]

9.     The fact that hundreds of Pinterest employees staged a virtual walkout to protest the racial and gender discrimination at the Company demonstrates Defendants' failure to properly acknowledge and rectify the rampant discrimination at the Company.

10.     When the news of the virtual walkout broke, Defendant Silbermann, who became one of the youngest billionaires when Pinterest went public,[4] admitted that he had not done enough to fix these repeated, egregious instances of employment discrimination, stating "[w]hat I've learned over the past few weeks is that *parts of our culture are broken*. Truthfully, I didn't understand just how much work we have to do.

---

[2] *See Brougher v. Pinterest, Inc.*, Case No. CGC-20-585888 (Cal. Super. Ct., Cnty. of S.F.).

[3] *See* Erin Griffith, *Pinterest Employees Demand Gender and Race Equality*, THE NEW YORK TIMES, Aug. 14, 2020, available at https://www.nytimes.com/2020/08/14/technology/pinterest-walkout-equality.html, last visited Dec. 14, 2020.

[4] *See* Amy Feldman, *Pinterest's Billionaire Founders May Keep Control, IPO Filing Suggests*, FORBES, March 22, 2019, available at https://www.forbes.com/sites/amyfeldman/2019/03/22/pinterest-files-for-april-ipo-as-more-unicorns-take-advantage-of-hot-stock-market/?sh=61807f7b1084, last visited Dec. 14, 2020.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

That's not an excuse, ***that's a failure in leadership*** …"

11.     On December 14, 2020, less than four months after Ms. Brougher filed her lawsuit, Pinterest announced that it had settled the action by agreeing to pay $22.5 million — "the largest publicly announced individual settlement for gender discrimination in U.S. history."[5]

12.     Pinterest's Directors have deceived stockholders and the market by repeatedly making false assertions about the Company's supposed intolerance for discrimination and its alleged commitment to diversity, equity and inclusion.  In doing so, the Directors have breached their duty of candor and have also violated the federal proxy laws.  Their conduct has also irreparably harmed Pinterest.

13.     Simply put, Pinterest has no *real* commitment to eliminating discrimination at the Company, and its Board is turning a blind eye to such discrimination by the Company's own CFO.

14.     The Director Defendants named herein all signed each of Pinterest's annual proxy statements.  With such signatures come an obligation to ensure that the statements in the Proxy were true and accurate, and to correct any misleading statements.  They failed to do so.

15.     As demonstrated herein, the Defendants knew of, but failed to disclose, unlawful business practices at Pinterest that put the Company at material risk — namely, racial and gender discrimination.  Had this information been disclosed, it would have been material to shareholders' voting decisions with respect to reelection of the Board members, vote on the say-on-pay proposal, and ratification of Ernst & Young LLP as the Company's auditor.

16.     The shareholder derivative lawsuit has been the only judicial mechanism

_____

[5] *See* Nitasha Tiku, *Pinterest Pays $22.5 Million to Settle Gender Discrimination Lawsuit by Former Female Executive*, THE WASHINGTON POST, Dec. 14, 2020.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

for shareholders to hold directors accountable for engaging in wrongdoing.  Like the United States Supreme Court, California courts have long recognized that derivative suits play an important role in corporate governance where directors fail to do their jobs:

> The derivative action is practically the only remedy for calling the management to account for its wrongs against the corporation and to obtain restitution. Where a derivative suit is against outsiders for wrongs against the corporation the directors can usually be expected to decide impartially on the advisability of suing. But the management cannot be expected to sue themselves for their own misdeeds.

*Pearce v. Super. Ct.*, 149 Cal. App. 3d 1058, 1065 (1983); *see also Vega v. Jones, Day, Reavis & Pogue*, 121 Cal. App. 4th 282, 297 (2004); *accord Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 95 (1991) (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 548 (1949)).   As the California Supreme Court recognized in *Jones v. H. F. Ahmanson & Co.*, where, as here, the company's board and management fail to perform their duties, stockholders have a "right" to bring derivative actions.  *See* 1 Cal. 3d 93, 107 (1969).  The courts of Delaware, Pinterest's state of incorporation, likewise acknowledge that derivative actions serve an important function: "The machinery of corporate democracy and the derivative suit are potent tools to redress the conduct of a torpid or unfaithful management."  *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984), *overruled in part on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

17.     As set forth below, Defendants' conduct constitutes bad faith and disloyal acts, giving rise to claims that fall outside the scope of the business judgment rule and outside of permissible indemnification by Pinterest.   As a result, all members of the Board face a substantial likelihood of liability and any demand on them to bring this case would be a futile and useless act.

## II.     JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action under Article III of the U.S. Constitution and 28 U.S.C. § 1331 because of claims arising under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and SEC regulation 14a-9 promulgated

thereunder.  The Court has exclusive jurisdiction under Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  The Court has jurisdiction over the state-law claims in accordance with 28 U.S.C. § 1367.

19.     This Court also has subject matter jurisdiction over this action under Article III of the U.S. Constitution and 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

20.     This Court has jurisdiction over Defendants.  Each Defendant is either a resident of California or otherwise has sufficient contacts with California in order to render the exercise of jurisdiction by this Court over them permissible under traditional notions of fair play and substantial justice.  Additionally, in connection with the misconduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.  The Court has jurisdiction over Pinterest because the Company is headquartered in San Francisco, California and has substantial business operations in California.

21.     Venue is proper in this District pursuant to Section 27 of the Exchange Act. Venue is also proper under 28 U.S.C. § 1391(b) because: (a) Pinterest maintains its principal place of business in this District; and (b) many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District.

III.     INTRADISTRICT ASSIGNMENT

22.     In compliance with Local Rule 3-2(d), Plaintiff requests that this action be assigned to the San Francisco Division of this District because a substantial part of the events or conduct giving rise to the claims in this action occurred in the County of San Francisco.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

IV.     **THE PARTIES**

    A.     **Plaintiff**

23.     Plaintiff Sal Toronto, Trustee of the Elliemaria Toronto ESA, is a current shareholder of Pinterest, and has continuously held Pinterest stock at all relevant times since May 2, 2019.

    B.     **Nominal Defendant**

24.     Pinterest is a Delaware corporation with its headquarters in San Francisco, California.

    C.     **Officer Defendants**

25.     Defendant Benjamin Silbermann is the co-founder, President, CEO, and Chairman of Pinterest's Board of Directors.  Pinterest's 2020 Proxy Statement indicated that Mr. Silbermann does not meet the independence requirements of the NYSE, on which exchange the Company's stock is traded.  Silbermann has significant control over Pinterest and owns 24.77% of the voting control of the Company's shares.  Silbermann received total compensation of $46,222,113 in 2019 from Pinterest, and he has amassed a fortune of $4.3 billion as a result of Pinterest.  Silbermann was a member of the Pinterest Board during all relevant times.

26.     Defendant Evan Sharp is the co-founder and Chief Creative & Design Officer at Pinterest.  Pinterest's 2020 Proxy Statement indicated that Mr. Sharp does not meet the independence requirements of the NYSE, on which exchange the Company's stock is traded.  Sharp has significant control over Pinterest and owns 4.82% of the voting control of the Company's shares.   Sharp received total compensation of $46,075,013 in 2019 from Pinterest, and he has amassed a fortune of $1.04 billion due to Pinterest.  Sharp was a member of the Pinterest Board during all relevant times.  Sharp ignored widespread discrimination at Pinterest.  Sharp served as a member of the Board of Directors in April 2019 when COO Brougher was excluded from Board meetings after raising pay equity concerns, but Sharp ignored those concerns and failed to take appropriate action.  Sharp was also on the Board when Brougher was fired, and failed to

7

take any meaningful steps to investigate the circumstances of her termination. Further, as the executive sponsor of Pinterest's Black employee resource group, Sharp was apprised that numerous Black employees had concerns about Pinterest's Legal and Human Resources ("HR") Department, but did nothing.

27.     Defendant Todd Morgenfeld is Pinterest's Chief Financial Officer.  In 2019, Morgenfeld was awarded total compensation of $22,389,196 by Pinterest. Defendant Morgenfeld discriminated against Brougher on the basis of her gender, including giving a biased performance review that ignored Brougher's accomplishments, retaliated against Brougher by excluding her from meetings and decisions after she complained, and by instead making decisions with her subordinates, and refusing to speak to or work with Brougher after she raised concerns about him.

### D.     Director Defendants

28.     Defendant Jeremy Levine has served as a Director of Pinterest since 2011. Levine has served as a partner at Bessemer Venture Partners since 2001.  In 2019, Levine received $294,995 in compensation from the Company.  Levine serves as a member of the Board's Nominating and Corporate Governance Committee.

29.     Defendant Jeffrey Jordan has served as a Director of Pinterest since 2011. Jordan has also served as a General Partner of Andreessen Horowitz since 2011. In 2019, Jordan received $291,245 in compensation from the Company.  Jordan serves as a member of the Board's Nominating and Corporate Governance Committee.

30.     Defendant Gokul Rajaram has served as a Director of Pinterest since 2020. Rajaram serves as a member of the Board's Nominating and Corporate Governance Committee.

31.     Defendant Fredric Reynolds has served as a Director of Pinterest since 2017.  Reynolds serves as a member and Chair of the Board's Audit Committee.  In 2019, Reynolds received $306,245 in compensation from the Company.

32.     Defendant Leslie Kilgore was a member of the Pinterest Board during all

8

relevant times.  She is a member of the Board's Audit Committee and the Compensation Committee.

33.    Defendant Michelle Wilson is a member of the Pinterest Board.  She is a member of the Audit Committee and the Compensation Committee.

34.    Defendants Silbermann, Sharp, Levine, Jordan, Rajaram, Reynolds, Kilgore, and Wilson are referred to herein as the "Director Defendants."  Defendants Silbermann, Sharp, and Morgenfeld are referred to herein as the "Officer Defendants."  Collectively, all defendants are referred to herein as the "Individual Defendants."

**E.     Doe Defendants**

35.    Except as described herein, Plaintiff is ignorant of the true names of defendants sued as Does 1 through 30, inclusive, and therefore, Plaintiff sues these defendants by such fictitious names.  Following further investigation and discovery, Plaintiff will seek leave of this Court to amend this Complaint to allege their true names and capacities when ascertained.  These fictitiously named defendants are Pinterest officers, other members of management, employees, and/or consultants or third parties who were involved in the wrongdoing detailed herein.  These defendants aided and abetted, and participated with and/or conspired with the named defendants in the wrongful acts and course of conduct or otherwise caused the damages and injuries claimed herein and are responsible in some manner for the acts, occurrences, and events alleged in this Complaint.

**F.     Unnamed Participants**

36.    Numerous individuals and entities participated actively during the course of and in furtherance of the wrongdoing described herein.  The individuals and entities acted in concert by joint ventures and by acting as agents for principals, to advance the objectives of the scheme and to provide the scheme to benefit defendants and themselves to the detriment of Pinterest.

9

## V.      RESPONSIBILITIES AND DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.      Responsibilities of the Individual Defendants

37.      Corporate officers and directors owe the highest fiduciary duties of care and loyalty to the corporation they serve.

38.      Board Members and Executive Officers are held to the highest level of ethics and compliance with the law.

39.      The Company's Corporate Governance Guidelines state that the primary duty of the Board is to exercise oversight of management:

> The primary function of the Board is oversight. The Board, in exercising its business judgment, acts as an advisor and counselor to senior management and defines and enforces standards of accountability, all with a view to enabling senior management to execute their responsibilities fully and in the best interests of the Company and its stockholders.[6]

40.      The Corporate Governance Guidelines also state that the Board's key responsibilities include:

●      *selecting, evaluating and compensating the Chief Executive Officer ("CEO") and other key executives, and planning for CEO and key executive succession;*

● *overseeing the Company's compliance with applicable legal and regulatory requirements and the processes that are in place to safeguard the Company's assets and manage material risks;*

● *monitoring the Company's accounting and financial reporting practices and reviewing financial and other controls; and*

---

[6] The Guidelines are available at https://s23.q4cdn.com/958601754/files/doc_downloads/gov_doc/Corporate-Governance-Guidelines-Final.pdf, last visited Dec. 14, 2020.

● *evaluating the Board's composition, performance and effectiveness in carrying out such responsibilities.*

41.    The Board is responsible for oversight and compliance with the Company's internal controls regarding diversity, anti-discrimination, pay equity, hiring and promotion.   As alleged herein, the Company's Board failed to act in good faith by failing to ensure compliance with these policies and controls, which existed on paper, but were knowingly disregarded.

42.    The Individual Defendants have known that, for years, the Company has lacked diversity on the Board and among senior management, and that women and Black employees and other minorities were conspicuously underrepresented and discriminated against at the Company's headquarters.   Despite this knowledge, the Board has failed to take sufficient corrective action.

43.    The Board knew the Company had policies in place on paper, but they failed to give the policies any teeth or enforcement.   The Board's conduct represented hypocrisy, bad faith, and disloyal conduct.   The Board had a duty to cause the Company to comply with the law and its own Code of Business Conduct and Ethics, and failed to do so.

44.    The direct involvement of Pinterest's Board makes them interested in the outcome of this litigation because they face a substantial likelihood of liability.   Demand is thus futile.

**B.    Fiduciary Duties of the Individual Defendants**

45.    By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continue to owe Pinterest and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Pinterest in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of Pinterest and not in furtherance of their personal

11

interest or benefit.

46.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of Pinterest were required to, among other things:

(a)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(b)     remain informed as to how Pinterest conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**C.     Breaches of Fiduciary Duties by the Individual Defendants**

47.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Pinterest, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

48.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to cover up Pinterest's discrimination, and caused Pinterest to incur substantial damage.

49.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Pinterest, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

improper actions.  As a result, and in addition to the damage the Company has already incurred, Pinterest has expended, and will continue to expend, significant sums of money.

### D.  Conspiracy, Aiding and Abetting, and Concerted Action

50.     At all relevant times, the Individual Defendants were agents of the remaining Individual Defendants, and in doing the acts alleged herein, were acting within the course of scope of such agency.  The Individual Defendants ratified and/or authorized the wrongful acts of each of the other Individual Defendants.  The Individual Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts, plans, schemes, and transactions that are the subject of this Complaint.

51.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of the improper acts, plans, schemes, and transactions that are the subject of this Complaint.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

52.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct, by failing to maintain adequate internal controls at the Company and covering up discrimination at the Company.

53.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did circumvent the internal controls at the Company and cause the Company to cover up Pinterest executives' discrimination.   In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

54.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, and waste of corporate assets, and to conceal adverse information concerning the Company's operations.

55.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by intentionally circumventing internal controls at the Company and causing the Company to cover up discrimination at the Company.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

56.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VI.     SUBSTANTIVE ALLEGATIONS

57.     As documents produced by Pinterest in response to Plaintiff's inspection demand demonstrate, Pinterest's Board has failed to fulfill its key duty of oversight of management, thus allowing gender and racial discrimination to fester at the Company. The failure at the top at Pinterest is significant.  The Board bears ultimate responsibility for ensuring the Company's compliance with federal and state laws prohibiting discrimination based on race, gender, and other factors.

58.     The Individual Defendants have had, at all relevant times, actual knowledge that discrimination and retaliation are major problems at Pinterest.  As an

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1 ██████████████████████████████████████████████████

2 ██████████████████████████████████████████████████

3 ██████████████████████████████████████████████████

4 ██████████████████████████████████████████████████

5 ███████████████████████████.[7]  *See* **Exhibit 1**.

6     59.    Upon information and belief,███████████████████████

7 ██████████████████████████████████████████████████

8 ██████████████████████████████████████████████████

9 ██████████████████████████████████████████████████

10 ██████████████████████████████████████████████████

11 ██████████████████████████████" *See* **Exhibit 2**.

12     60.    █████████████████████████████████████████

13 ████████████████████████████████."[8]  *Id.*  Pinterest's Audit Committee is

14 comprised of Defendants Michelle Wilson, Leslie Kilgore, and Frederic Reynolds.

15     61.    █████████████████████████████████████████

16 ██████████████████████████████████████████████████

17 ██████████████████████████████████████████████████

18 ██████████████████████████████████████████████████

19 ████████████████████████."  *See* **Exhibit 2 at** PINS-220_0000423.  ███████

20 ██████████████████████████████████████████████████

21 ██████████████████████████████████████████."[9]  *See*

22 **Exhibit 3**.████████████████████████████████████████

23 ██████████████████████████████████████████████████

24

[7] *See* **Exhibit 1** at ████████████.
[8] *See* **Exhibit 2** at ████████.
[9] *See* ████████████.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    ████████████████████████████████.["10]

2        62.    Defendants Kilgore, Reynolds, and Wilson, as members of Pinterest's

3    Audit Committee, ████████████████████████████████████████████

4    ████████████████████████████████████████████████████████████

5    ███████████████████████████████████████████████████. *See*

6    **Exhibit 4**. ████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████

9    ██████████████  ██████████████████████████████████████████

10   ████████████████████████████████████████████████████████████

11   ███████████████████████████████████████████.["12] *See* **Exhibit 5**.

12       63.    Audit Committee members Kilgore, Reynolds, and Wilson were also

13   provided with ████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████

17   ████████████████████   [13]    As noted herein, in breach of their fiduciary duties and

18   obligation to ensure adequate internal controls, the Audit Committee failed to obtain

19   independent guidance on key regulatory issues for the Company, and instead received

20   advice from the very people complicit in Pinterest's wrongdoing. Christine Flores,

21   General Counsel and Corporate Secretary, and Taylor failed to heed Ifeoma Ozoma's

22   and Aerica Shimizu Banks' warnings regarding the LiveAction doxxing, failed to

23   promptly provide physical security to employees, and failed to promptly work to scrub

---

[10] *Id.*
[11] *See* **Exhibit 4** at ██████████████████.
[12] *See* ██████████████████.
[13] *See* ██████████████.

its employees' information from the Internet.  Further, Flores retaliated against Ozoma and Banks for raising discrimination concerns, including demoting Banks and leading invasive and retaliatory investigations designed to frame Ozoma.

64.   Despite receiving clear information that Pinterest faced dozens of discrimination and retaliation claims, Pinterest's Audit Committee breached its duty of loyalty and good faith by failing to take action to stop systemic discrimination and retaliation at Pinterest.

65.



."

66.   Moreover,

.  *See* **Exhibit 2** at

."[14]

67.

_____

[14] *See*                  .

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  ████████████████████████████████████

2  ████████████████████████████████████

3  ████████████████████████████████████

4  ████████████████████████████████████

5  ████████████████████████████████████

6  ████████████████████████████████████

7  ████████████████████████████████.”

68.     The Board wrongfully allowed Silbermann to participate in the meeting. As noted herein, Silbermann was not independent and objective, and faced personal liability, because he had approved lower compensation for Brougher, and had allowed systemic discrimination at Pinterest to fester.  After hiring Brougher for her expertise taking companies public and increasing advertising revenue, Silbermann cut her out of significant decisions, instead relying on White, male colleagues who did not question him or his authority.   Silbermann wrongfully excluded Brougher from the pre-IPO roadshow process in favor of his male friend.  After the IPO, Brougher was no longer invited to Board meetings (instead subordinates on her team were invited), a matter of which Silbermann was aware or decided as Chair of the Board.  After Brougher raised concerns about Morgenfeld, Silbermann brushed her off; when Morgenfeld refused to work with Brougher, Silbermann chose to punish Brougher, ultimately fired her, and asked her to sign an NDA and lie to her team about the circumstances of her departure. Silbermann repeatedly placed himself before the Company, surrounding himself with yes-men and marginalizing a female executive who dared to challenge Pinterest's leadership clique.  Silbermann's discrimination against Brougher and failure to stop the discrimination against other female employees breached his fiduciary duties to the Company.

69.     Further, *Silbermann was aware of and did nothing to stop the discriminatory and retaliatory treatment of Ozoma and Banks*.

70.     Earlier in the year, Ben Horowitz, a co-founder of Andreesen Horowitz, one of Pinterest's major shareholders which appointed Defendant Jordan to Pinterest's Board and which holds stock giving its 13.43% of Pinterest's voting stock, made racially insensitive remarks highly offensive to Pinterest's employees.  USA Today reported that Horowitz made controversial remarks at Pinterest on Thursday, January 9, 2020 during a company-wide fireside chat in which he compared prison culture to corporate culture.

71.     The USA Today article stated:

> According to screenshots leaked to USA TODAY, Pinterest employees reacted with shock and horror as Horowitz used a violent incident in prison – a shanking – to illustrate the need for people to adapt to the culture in which they find themselves.

> Horowitz and friend Shaka Senghor, a former prison gang leader, have publicly discussed the parallels between prison and corporate America. The insights Horowitz drew on come from his recent book, "What You Do Is Who You Are: How to Create Your Business Culture."

> "I'm extraordinarily uncomfortable with using slavery and prison culture as 'good examples' for drawing the lessons we need to draw," one employee wrote. "To use a man's need to survive in prison and turning it into a joke for how that's like new hire orientation."[15]

72.     The "tone at the top" at Pinterest is extremely important, especially given the Company's dual class stock structure that, even after the Company's IPO, concentrated voting control among the Company's founders and seed venture capital firms.  As the chart below from the Company's 2020 Proxy Statement demonstrates, Silbermann, Sharp, and two of the Company's original venture capital firms (Andreesen Horowitz and Bessemer Ventures) alone own stock giving them a collective 62.45% voting control at Pinterest.  They are thus able to control the Board and all aspects of the Company's operations:

---

[15] *See* Jessica Guynn, *Ben Horowitz Slammed for Prison, Slavery Comments During Pinterest Company Fireside Chat*, USA TODAY, Jan. 9, 2020, available at https://www.usatoday.com/story/tech/2020/01/09/ben-horowitz-slammed-slavery-prison-comments-pinterest/4425548002/, last visited Dec. 18, 2020.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| Name of Beneficial Owner | Class A Common Stock | | Class B Common Stock | % of Total Voting Power | % of Class |
| | Shares | % of Class | Shares | | |
| --- | --- | --- | --- | --- | --- |
| **Named Executive Officers and Directors** | | | | | |
| Benjamin Silbermann[(1)] | — | — | 50,246,508 | 27.47 | 24.77 |
| Evan Sharp[(2)] | — | — | 9,774,358 | 5.34 | 4.82 |
| Françoise Brougher[(3)] | — | — | 244,362 | * | * |
| Christine Flores[(4)] | 294,872 | — | 148,091 | * | * |
| Todd Morgenfeld[(5)] | 726,345 | * | 81,518 | — | * |
| Jeffrey Jordan[(6)] | 131,239 | * | — | — | * |
| Lesley Kilgore[(7)] | 9,671 | * | 6,837 | — | * |
| Jeremy Levine[(8)] | 654,342 | * | — | — | * |
| Gokul Rajaram[(9)] | 1,531 | * | — | — | * |
| Fredric Reynolds[(10)] | 49,671 | * | 56,250 | * | * |
| Michelle Wilson[(11)] | 9,671 | * | 100,000 | * | * |
| All directors and executive officers as a group[(12)] | 1,877,342 | * | 60,698,505 | 33.18 | 29.97 |
| **Other 5% Stockholders** | | | | | |
| Entities affiliated with Bessemer Venture Partners[(13)] | — | — | 38,647,781 | 21.13 | 19.05 |
| Entities affiliated with Andreessen Horowitz[(14)] | 1,161,760 | * | 27,192,626 | 14.87 | 13.43 |
| Paul Sciarra[(15)] | — | — | 41,607,697 | 22.75 | 20.51 |
| Entities affiliated with FirstMark[(16)] | 13,322,293 | 3.34 | 22,203,819 | 12.14 | 11.27 |
| The Vanguard Group[(17)] | 23,674,680 | 5.93 | — | — | * |
| Flossbach von Storch AG[(18)] | 22,022,939 | 5.52 | — | — | * |
| FMR LLC[(19)] | 21,835,568 | 5.47 | — | — | * |

73. ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████   As the facts above demonstrate, these directors are not independent and

disinterested because they were provided with actual knowledge of the rampant

discrimination at Pinterest and yet did nothing to curtail the discrimination. ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

**A.    Pinterest Refuses to Publish a Pay Equity Report, Therefore Hiding Disparity in Pay from Public Scrutiny**

2

74.    To attempt to hide systemic discrimination at Pinterest, the Board has

3    refused to cause Pinterest to publish an annual pay equity report.  Publication of such a

4    report is now considered an employment best practice because it promotes transparency

5    and helps eliminate inequitable pay among employees performing the same or similar

6    jobs.   The Individual Defendants have refused to publish the report because they know

7    the results would reveal the existing discrimination and pay gaps.

8

75.    The racial pay gap is well-documented and persistent. According to data

9    from the Economic Policy Institute, Black workers "have been losing ground since 2000,

10    with larger [B]lack-white wage gaps across the entire distribution of earnings."[16] For

11    example, Black wages at the median in 2019 were only 75.6 percent of white wages, a 3.6

12    percent increase from 2000, when Black wages at the median were 79.2 percent of white

13    wages.[17] Even when looking at wages by education level, Blacks are paid less than

14    whites. Blacks with advanced degrees are paid 82.4 cents for each dollar earned by

15    whites with an advanced degree.

16    / / /

17    / / /

18    / / /

19    / / /

20    / / /

21    / / /

22    / / /

23    / / /

24

25    [16] *See* Elise Gould, *State of Working America Wages 2019*, ECONOMIC POLICY INSTITUTE, Feb. 20, 2020, available at https://www.epi.org/publication/swa-wages-2019/, last visited August 4, 2020.

26    [17] *Id.*

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



## On average, white workers are paid more than black and Hispanic workers at nearly every education level

Average hourly wages, by race/ethnicity and education, 2019

**Source:** Author's analysis of EPI Current Population Survey Extracts, Version 1.0 (2020), https://microdata.epi.org

**Economic Policy Institute**

76.    The practice of asking job applicants for their salary history has also perpetuated lower compensation for Blacks and minorities.

77.    In 2016, Massachusetts enacted the first ban, preventing employers from asking job candidates about their salary history. Since then 18 other states, as well as

many cities, have implemented salary history bans.[18] The goal of these bans is to prevent initial wage disparities from multiplying as individuals move from one job to another. "Employers should be hiring and paying potential employees for the experience and qualifications they have," said New Jersey Senator Loretta Weinberg in discussing the law that New Jersey enacted.  "Knowing how much they were paid in the past is irrelevant and often times leads to a cycle of pay inequity.  By eliminating inquiries of salary history, we can help curb wage discrimination based not only on gender, but also race, age and other characteristics," Weinberg added.

78.     While each state's bill is slightly different in terms of the scope of employers covered and the explicit intent, the overall goal is to prevent employers from anchoring salary offers on previous salaries and unintentionally perpetuating the wage gap.

79.     In a recently released working paper, researchers at Boston University found that, following the implementation of salary history bans (SHB), pay for job switchers increased by 5 percent more than for comparable job changers.[19]  Moreover, they found even larger benefits for Black and female job switchers, who saw pay increases of 13 percent and 8 percent, respectively.  "Salary histories appear to account for much of the persistence of residual wage gaps," the authors note.  "For women and African-Americans, the pay increases following an SHB represent a sizeable portion of the residual wage gap measured for job-changing employees, suggesting that most of this gap is not related to productivity differences between workers.[20]

80.     The study's authors note that wage gaps may not be caused by individual and overt discrimination, but that "salary histories enable a form of institutional

---

[18] *See* Shahar Ziv, *Salary History Bans Reduce Racial and Gender Wage Gaps; Every CEO Should Use Them*, FORBES, June 23, 2020.
[19] *Id.*
[20] *Id.*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

discrimination. Even if employers do not individually discriminate, the use of salary histories appears to perpetuate the effects of past discrimination or other group inequities."[21]

81.     Pinterest has failed to publish a pay equity report, thus contributing to a lack of public scrutiny of the pay equity gap.

82.     In January 2020, Pinterest published a diversity report, in which it reported on progress supposedly made in meeting its own internal goals related to hiring more women and minorities.[22] But it did not include statistics and data regarding pay equity.

83.     The information Pinterest did provide demonstrates a continuing failure to achieve true diversity at the Company.  Blacks still comprise just 4% of all positions at the Company, and that number was only reached by providing an outsized portion of low-level "sales intern" positions to African Americans.

84.      Pinterest staffed 20% of the Sales Intern positions with African Americans in an attempt to get its numbers up.  It did the same with respect to Hispanics/Latinos, which received 30% of the Sales Intern positions.  Pinterest failed to disclose whether the intern positions are even paid.  Meanwhile, Blacks constitute only 1% of Leadership positions at Pinterest and women comprise only 25% of Leadership positions, as reflected in the attached chart provided by Pinterest in its report:

/ / /

/ / /

/ / /

/ / /

/ / /

---

[21] *Id.*
[22] The report is available at https://newsroom.pinterest.com/en/post/diversity-report-2020, last visited Dec. 14, 2020.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



**B.    At All Relevant Times, the Individual Defendants Have Had Actual Knowledge that Pinterest Has Failed to Comply with Its Own Policies of Promoting Diversity and Prohibiting Discrimination, Yet the Individual Defendants Have Continued to Refuse to Take Action**

85.    The Board has consistently been presented with red flags of discrimination but refused to act to protect female workers and minorities.

86.    In August 2020, the Company's highest-ranking female executive, Francoise Brougher, filed a gender discrimination lawsuit against Pinterest.  Ms. Brougher received total compensation in 2019 of $21,737,038.  For the highest-ranking female executive of the Company earning over $21.7 million to be forced to quit over the discrimination, the situation had to be bad.  And if it was intolerable for Brougher, it was even worse for lower-level female executives.

87.     Pinterest's lawyers must not have thought much of the Company's defense.  On December 14, 2020, just four months after Brougher had filed the case, Pinterest announced it was settling the case by agreeing to pay $22.5 million — allegedly the largest individual gender discrimination settlement in U.S. history.

88.    Ms. Brougher's lawsuit included charges that Pinterest created a hostile work environment for female workers and engaged in discriminatory pay and promotion practices.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

89.     Brougher had been hired by Pinterest in March 2018 to serve as the Company's first Chief Operating Officer and help it gear up for an IPO.

90.     In less than two years at Pinterest, Brougher increased the Company's revenues from $500 million to $1.1 billion, increased the advertiser base from 10,000 to 80,000, and expanded operations to 20 countries. Half the Company's employees reported to her.

91.     After she joined Pinterest, Brougher discovered that she was underpaid compared to similar male executives. Because she was one of Pinterest's highest-ranking executives, Brougher was not assigned a level like other Pinterest employees.  The bulk of Brougher's compensation was not in salary, but in stock grants and equity.

92.      Pinterest's Board (composed of Defendants Silbermann, Levine, Jordan, Wilson, Kilgore, and Reynolds) had directly approved Brougher's compensation, and told Brougher that all executives receive equity grants which vest over time, meaning that the majority of an executive's shares do not vest within the first year.  Brougher's equity grants followed this structure, which she believed to be common to all Pinterest executives.

93.     Brougher subsequently learned, however, that she was being paid less than men.  In advance of its IPO, Pinterest was required to file a S-1 Registration Statement with the SEC in March 2019.  The S-1 disclosed that male workers had more favorable vesting schedules, with little to no backloading.  Specifically, Morgenfeld, Brougher's closest peer, received 812,500 shares in his first year, whereas Brougher received 300,000 shares — 63% fewer.

94.     At the time of the IPO, Brougher's shares would have been valued at $5.7 million, whereas Morgenfeld's were valued at three times that amount — $15.4 million.

95.     Brougher's equity grant also provided that only ten percent of the shares vested the first year; twenty percent vested the second year; thirty percent vested the third year; and forty percent vested the fourth year.  By contrast, Morgenfeld's stock

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    award had no backloading.

2        96.    Pinterest then, in advance of the IPO, offered Brougher an IPO retention

3    grant that was even more backloaded.  Starting in March 2019, Brougher was to receive

4    stock over five years with the last two years making up most of the award.  Zero stock

5    vested in the first year, five percent in the second year, five percent in the third year,

6    forty-five percent in the fourth year, and forty-five percent in the fifth year.  Other

7    officers' retention grants were far less backloaded.

8        97.    Defendant Silbermann was contacted by Brougher to discuss this disparate

9    and unfair treatment, and Silbermann directed her to Human Resources.  Eventually, as

10   a result of Brougher's complaint, Pinterest modified Brougher's IPO retention grant, but

11   only after she presented a spreadsheet illustrating the inequity and fought for equal

12   treatment. However, even with this adjustment, Brougher was not made whole.  Further,

13   equity packages for other senior women executives at Pinterest continued to be

14   backloaded, disadvantaging them in the same way that Brougher was disadvantaged

15   before Pinterest partially corrected it.

16       98.    Brougher was also subjected to additional forms of sex discrimination at

17   Pinterest.  Like Ozoma and Banks, after advocating for fair treatment in her retention

18   grant, Brougher was marginalized and excluded from decision-making at the Company.

19   Even though as COO she was formally second only to Silbermann in Pinterest's

20   leadership structure, in practice, important decisions were often made in sidebar

21   conversations between "Ben and two or three of his lieutenants, invariably men."

22   According to Brougher, "Ben appeared to listen to only a few people and sealed himself

23   off from opposing viewpoints.  Ben's 'in group,' the men invited to 'meeting after the

24   meeting,' held all the power and influence."

25       99.    Silbermann marginalized Brougher to the Company's detriment. Brougher

26   noted a revenue decline in the quarter following Pinterest's IPO, which she ultimately

27   concluded resulted from an engineering team decision that had not been conveyed to

28

her team.  When Brougher raised the concern that she was being cut out of key meetings and that ad revenue was declining because advertisers found Pinterest's product difficult to use, Silbermann disinvited her from the product team meetings that he led. Excluded from meetings where decisions were made, Brougher was unable to do her job successfully, directly harming the Company's revenue generation.

100.   In addition, when Brougher raised questions with Silbermann about strategy decisions, he criticized her for not being collaborative and said she did not have healthy cross-functional relationships.  Silbermann could not provide any specifics, instead telling her to "be mindful" of how she acted. Notably, in her mid-year performance review, Silbermann omitted her objective success in driving revenue, which had risen from less than $500 million to over $1.1 billion during her tenure.

101.   ***Silbermann and the Board unlawfully retaliated against Brougher by excluding her from the IPO roadshow***.  Even though she was Pinterest's number two executive, specifically hired for her IPO experience, Brougher was the only executive on the team who had taken a company public before, and though she already had relationships with some of the investors the team would be meeting, ***Silbermann told Brougher to not come to the roadshow***. ***Instead, he invited a male friend***, the Head of Global Communication — even though that person was superfluous because his role overlapped with another attendee, the Head of Investor Relations.

102.   ***After the IPO, the Board of Directors retaliated against Brougher by ceasing to invite her to present at its meetings***.  At times, members of her team were invited, sometimes without her knowledge. But as the COO of Pinterest, Brougher no longer had meaningful engagement with the Board.

103.   Around January 2020, Morgenfeld became increasingly disrespectful to Brougher.  He would ignore her and undermine her authority by talking directly to her team members, even if he knew she was leading a particular project.  In one meeting, Morgenfeld disparaged her in front of her peers by sarcastically asking, "What is your

job anyway?" Most of Morgenfeld and Brougher's one-on-one meetings were taken off calendar, shutting down avenues for communication between them.

104.    Then, in February 2020, Brougher received a peer review from Morgenfeld, in which he dismissively identified Brougher's only 2019 achievement as "[s]eems to be a champion for diversity issues," totally ignoring her accomplishments in increasing advertisers, users, and revenue.  As Brougher's lawsuit alleges, "[b]y focusing only on 'diversity,' Mr. Morgenfeld … ignored and therefore demeaned Brougher's many significant accomplishments as COO in 2019, including: scaling the business team to transition from a private to a public company, diversifying Pinterest's advertiser base, and leading an effort to expand the company's monetization efforts in Europe. His snide comment was further enfeebled by his use of the verb 'seems,' which cast doubt on whether she really did champion diversity (her only perceived accomplishment) or merely seemed to do so."  As Brougher's complaint notes, "[r]educing a female executive's achievements to "diversity" is a common form of gender discrimination."

105.    ***Morgenfeld then called Brougher a liar when she attempted to address the review with him, questioned the value she brought to the Company, and hung up on her***. Brougher raised concerns about this conversation to Silbermann, who failed to take any steps to meaningfully investigate and prevent discrimination against the Company's number-two executive.  Instead, he inappropriately minimized the problem, likening it to an old couple fighting over who made coffee and said the HR department would work it out.

106.    Morgenfeld then stopped speaking to Brougher entirely, did not acknowledge her in meetings, and went behind her back when he needed things from her team members. Pinterest's Human Resources department promised to have a meeting to bring the two together, but the meeting never happened.

107.    At the end of March, Pinterest's Chief Human Resources Officer sent Brougher a note that the investigation into Morgenfeld's behavior was closed and that

Morgenfeld was found to have done nothing wrong. Brougher responded that she needed help to repair their working relationship in order to perform her job. Pinterest's HR department never answered.

108. ***Shortly thereafter, Silbermann fired Brougher and told her to transition her responsibilities to Morgenfeld***. In what has proved a common refrain for Silbermann, he expressed that he was "sad" about having to fire someone so "logical" — as if he, the CEO and Board Chair had no control over the decision.

109. Thereafter, Silbermann tried to cover up the truth by falsely telling Brougher's team that she had decided to leave the Company, and offered Brougher a non-disclosure agreement. Brougher refused to hide the true reason for her departure and declined the non-disclosure agreement.

110. Brougher also published an article on Medium after she filed her lawsuit against Pinterest, and also Tweeted about her experience. In her story on Medium, "The Pinterest Paradox: Cupcakes and Toxicity," Brougher shared her own story and indicated that other women had suffered gender discrimination at Pinterest. Brougher wrote: "***I heard stories of blatant gender discrimination. Certain teams could not retain women because the workplace was so toxic***."

111. On August 11, 2020, The New York Times ran an article entitled "Pinterest Accused of Gender Bias in Suit by Former No. 2 Executive."[23] The article quoted Brougher as stating: "***Gender discrimination at the C-level suite may be a little more subtle, but it's very insidious and real. When men speak out, they get rewarded. When women speak out, they get fired***." In the article, Brougher recounted discriminatory and disrespectful treatment she had received at the hands of Morgenfeld, including being

---

[23] *See* Erin Griffith, *Pinterest Accused of Gender Bias in Suit by Former No. 2 Executive*, THE NEW YORK TIMES, Aug. 11, 2020, available at https://www.nytimes.com/2020/08/11/technology/pinterest-francoise-brougher-gender-discrimination-lawsuit.html, last visited Dec. 15, 2020.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

excluded from the pre-IPO roadshow and being excluded from Board meetings after the Company went public (while bringing in members of her team without her knowledge). Griffith also shared the demeaning exchange in which Morgenfeld, in front of Brougher's peers asked her, "[w]hat is your job, anyway?"

112.    The New York Times article noted that "Ms. Brougher is one of the most prominent female tech executives to file a gender discrimination suit against her onetime employer since the venture capitalist Ellen Pao sued her firm, Kleiner Perkins Caufield & Byers, in 2012."

113.    Pinterest noted that the Company needed to change its culture so "all of our employees feel included and supported," implicitly acknowledging that Pinterest had failed to do so in the past.

114.    Former employees were quoted on August 13, 2020 as blaming Silbermann for creating a White, male inner circle that created an unfair work environment for women and people of color.  One former employee stated, "[a]nyone who has worked at Pinterest knows that culture starts from the top with Ben which is reinforced by his small band of male cronies … For too long, Ben has claimed to not understand what's going on at his own company.  The time is up for Ben Silbermann."[24]

115.    In response to Brougher sharing her story on Twitter, numerous former Pinterest employees echoed her experience including one who wrote, "Thank you for sharing!  Many of the things you shared rang true for me as well during my 4 years at Pinterest."

116.    On August 14, 2020, Pinterest employees staged a virtual walkout and circulated an employee petition that garnered 445 signatures calling for transparency on

---

[24] *See* Ashley Gold, *Dark Clouds Envelop Feel-Good Pinterest*, AXIOS, Aug. 13, 2020, available at https://www.axios.com/dark-clouds-envelop-feel-good-pinterest-66ab2991-f069-4baf-9b21-c855274123b7.html, last visited Dec. 21, 2020.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

promotion and retention, total compensation package transparency at all levels of the Company, and 25% women and 8% underrepresented minorities within two layers of reporting to the CEO.

117.    The New York Times ran an article the same day entitled, "Hitting the Glass Ceiling, Suddenly, at Pinterest."[25]   The article stated: "The stories of gender exclusion I heard this week from women working at Pinterest and their former colleagues were numbingly similar, with most using the same words over and over again: Sidelined.  Shut down.  Doors closed.  Inner circles.  Toxic secrecy.  Homegrown boys club.  Left out of meetings.  Out of key decisions.  Out of promotions.  Out."  The author reported that most current and former employees she had interviewed indicated that management favored men over women and treated people of color worse.

118.    When the author of the New York Times article pointed out to Silbermann that the management page on Pinterest's website at the time featured three men and no one else, Silbermann "responded, 'I had no idea.'"  Silbermann reportedly conceded that changes needed to be made.

119.    On September 11, 2020, The Verge published an article titled "Inside Pinterest, More Tales of Workplace Discrimination", with numerous serious accounts of discrimination suffered by members of Pinterest's Finance team.  The article profiled a member of the Finance team who had access to payroll data and realized that Black employees were materially underpaid relative to their White colleagues.  When he presented this data to the HR department, they questioned why he had gathered the data.  He left the Company soon thereafter and, like Banks, saw his expenses receive unusual scrutiny — he was demanded to repay expenses on his corporate credit card,

---

[25] *See* Kara Swisher, *Hitting the Glass Ceiling, Suddenly, at Pinterest*, THE NEW YORK TIMES, Aug. 14, 2020, available at
https://www.nytimes.com/2020/08/14/opinion/pinterest-discrimination-women.html, last visited Dec. 21, 2020.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

including team happy hours and Wi-Fi on work-related flights.  Other managers did not receive the same scrutiny, and he believed it was in retaliation for him raising pay equity concerns.   The Company threatened to take him to court if he did not repay the expenses, so he did.

120.   Other female employees at Pinterest similarly observed that male executives received outsized equity grants compared to female colleagues.  A female executive on the finance team reported being underpaid relative to male colleagues.  The person who held the position before her managed both payroll and equity; although she asked to manage both functions, she was denied because she was told the Company no longer wanted those functions combined.  But when she left, she was replaced by a male employee who got to manage both payroll and equity — exactly what her male predecessor received, and she had been denied.

121.   The article also recounted the experiences of McKenna Rogers ("Rogers"), who joined Pinterest's finance team in 2018.  Rogers reported that her supervisor treated her in a sexist and inappropriate manner: asking probing questions about her personal life, including who she was dating; expressing excitement that she had dated someone that she had met at work (indirectly suggesting she may be open to dating him); and making an inappropriate sexualized joke in a team meeting.  After Rogers declined his advances and went to the HR department for help, her supervisor cancelled meetings, cut her off from work, and berated her.  The HR department did not help Rogers, ultimately terminating its investigation of her manager and giving her resources to request a leave of absence.  In addition to reporting to HR, Rogers expressed concerns about her manager in a pulse survey.  When Rogers left Pinterest, she told the HR department and her manager in writing that she was leaving because of the poor treatment and that she had developed PTSD during her time at Pinterest.

**C.** **Before Brougher Filed Her Gender Discrimination Lawsuit, Two Other Female Employees Reported Gender Discrimination at Pinterest But Their Complaints Were Disregarded by the Individual Defendants**

122.    Brougher was by no means the only female executive at Pinterest to be subjected to gender discrimination.   And for every employee that files a complaint, studies have shown that many other affected employees never file complaints out of fear of retaliation.   The experience of two other former female employees at Pinterest demonstrates the basis for such concern.

123.    The two other former employees — Ifeoma Ozoma and Aerica Shimizu Banks, brought the gender discrimination to the Company's attention, but were rebuffed.

124.    Ozoma graduated from Yale University and worked at Google and Facebook before joining Pinterest.   In July 2018, Ozoma was contacted by a Pinterest recruiter about joining the Company to run its United States policy, develop relationships with key third-party governmental and non-governmental organizations like the Center for Disease Control and National Suicide Prevention Lifeline, and to bring those organizations' public health expertise into Pinterest.

125.    This represented a unique opportunity for Ozoma.   Established social media companies like Facebook and Google had public policy teams with hundreds of employees.   At Pinterest, Ozoma would be the second member of the public policy team, which at the time was staffed exclusively by Charlie Hale ("Hale"). Ozoma was promised the chance to build the team from the ground up before the Company went public.

126.    Ozoma accepted the offer and joined Pinterest as the Public Policy and Social Impact Manager, playing a critical role in Pinterest's policies to block health misinformation and disinformation.

127.    Despite her credentials and public success on the Company's behalf, Ozoma soon learned that Pinterest misled her about her compensation and underpaid her compared to Hale — a White man with whom she worked as a close partner and

34

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

split work equally.

128.     Pinterest, like most tech companies, sets pay via "leveling."   Each business unit within Pinterest has its own pay scale comprised of a series of levels, with pre-determined pay ranges for each level based on a set of criteria. Most business units have eight levels.  Upon hiring, a new employee is assigned to a level and to a salary within that level. Pinterest managers are given discretion to set a new employee's pay within the salary range for her level.  Over time, a successful employee can receive a raise within their level or move up to a higher level.

129.     When Pinterest hired Ozoma, she vigorously negotiated her compensation and was told that her offer was the best the Company could do for the role (not for her, but for the role).  She was not explicitly told her level or the criteria for that level.  In September 2018, several months after she started at the Company, Ozoma saw for the first time the Public Policy level chart, which sets forth the criteria and pay for each of the levels within a department at Pinterest.  She discovered that she was hired as a level 4, the second to lowest level for her team; by contrast, Hale was at the highest pay level, a level 8.  This differential existed despite the fact that Ozoma had more relevant experience than Hale and that her work, including leading half of the global public policy team's work and building the team, made her Hale's co-equal.

130.     Hale told Ozoma that they would address her pay at the end-of-year performance cycle.  But she did not receive a satisfactory answer or any meaningful promotion at the end of 2018.

131.     Nonetheless, Ozoma continued her diligent work for the Company. Working in close partnership with Pinterest's Trust and Safety team and content policy teams, both of which are responsible for content moderation and ensuring a positive and safe user experience, Ozoma developed Pinterest's misinformation and disinformation policy.  That policy was still in use at the time of her departure from the Company.  In February 2019, Pinterest implemented that policy to prohibit anti-vaccination content on

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Pinterest — a groundbreaking move long before any other Silicon Valley company tried to address health misinformation.

132.    Ozoma's valuable work on Pinterest's anti-vaccination content ban increased the Company's valuation just in time for its IPO.  The Company was rewarded for Ozoma's leadership with its best-ever news cycle, with positive articles in The Wall Street Journal, CNN, NPR, Fast Company, and other top outlets in the weeks prior to the IPO.  The vaccine policy was cited as a positive example of a social media company actually responding to misinformation, and featured Ozoma as Pinterest's public spokesperson.

133.    On April 18, 2019, Pinterest went public at $19 a share, with a $10 billion valuation.

134.    That day, Hale acknowledged in an email to Ozoma that many of the IPO news stories referenced her work.

135.    But even after the IPO, Pinterest refused to fairly value Ozoma's contributions. After asking Pinterest for the better part of a year to assign her the pay level she deserved and being summarily ignored, in May 2019, Ozoma hired a lawyer. When Ozoma's attorney asserted that Pinterest should have hired her at level six, two levels higher on the pay scale than her junior level of four, Pinterest responded by arguing that Ozoma had insufficient years of experience to be assigned a higher pay level, a criterion which did not appear on the level chart.

136.    In the spring of 2019, Ozoma was at a Pinterest women's group event, sitting in the front row.  Hale was one of two men among three supervisors leading a panel on how women should negotiate for pay increases.   According to Business Insider's investigation, Hale is "part of CEO Ben Silbermann's inner circle."  Hale, who had stonewalled Ozoma's requests for pay increases, looked directly at her when he delivered the message: "adjust your expectations," offering the guidance that "you should only ask for what you deserve."   Ozoma described Hale's performance as

1  "gaslight[ing]" her by publicly critiquing her request for a pay increase.  Hale's public

2  rebuke reflected a classic racist and sexist response, attempting to blame the victim and

3  avoid the merits of the issue.

4      137.    In May 2019, Banks joined Ozoma at Pinterest in the role of Head of

5  Federal Affairs, becoming the third member of the public policy team. Banks identifies

6  as a Black and Japanese woman.  Like Ozoma, she is extraordinarily well-credentialed —

7  she spent six years at Google in Executive Recruiting and on the Legal Team working on

8  patent policy and developing diversity, equity, and inclusion policies; was an appointee

9  in President Barack Obama's administration; and holds a Masters in Science degree from

10  Oxford University.

11      138.    When Banks was hired, her role was described to her as an equal partner

12  with Hale; her responsibilities were loosely defined but she was promised that she

13  would be given a budget for her work and that promotion would be based on the quality

14  of her work, not her tenure at the Company.   In particular, the Company was

15  enthusiastic about her past deep work in racial equity and her connections in

16  Washington, D.C.

17      139.    Like Ozoma, Banks did not see the level chart until after she was hired.

18  However, during her salary negotiations, Banks was told that Ozoma had played a role

19  in creating the public policy team's level chart along with Hale and that Ozoma was

20  apprised of every aspect of Banks' hiring. Neither was true.  Banks later concluded that

21  Hale "outright lied to me during the negotiation process on leveling, pay, and

22  promotion."  Hale created the level chart.  Ozoma had no role in creating the level chart

23  and, to the contrary, challenged its application as to herself at the very time Banks was

24  being recruited to join her team.  And, although Banks was hired at a level higher than

25  Ozoma, that level was still lower than appropriate for the work Banks actually

26  performed.

27      140.    Despite her unequal and discriminatory pay and leveling, like Ozoma,

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Banks excelled in her job and did meaningful social impact work that brought positive attention to Pinterest, including leading the Company's sustainability efforts and managing due diligence to establish Pinterest's philanthropic arm.  Additionally, Banks opened Pinterest's Washington, D.C. office and served as the Company's representative with government officials.  Also, it was Banks who decided the division of labor for the three team members (herself, Ozoma, and Hale).

141.    In the year following Pinterest's IPO, the Company continued publicly celebrating and deriving value from the work of Banks and Ozoma while continuing to pay them unfairly and engaging in a retaliation campaign against them and their closest colleagues.

142.    As a social media platform, Pinterest is constantly making content moderation decisions to ensure that the material placed on the platform by users does not violate law and is consistent with Pinterest's policies.

143.    In June 2019, Pinterest made the decision to block content from LiveAction, an advocacy organization.  The Company made this choice because it determined that LiveAction spread "harmful misinformation, [which] includes medical misinformation and conspiracies that turn individuals and facilities into targets for harassment or violence," which violated Pinterest's policies.

144.    After this decision was made, a White, male Pinterest employee secretly leaked documents related to this and other content moderation decisions to Project Veritas, an extremist news site best known for its undercover videos.

145.    Thereafter, articles began being published by LiveAction.  The articles at first included a timeline of Pinterest's decision-making that made it very likely that an employee had leaked this information; Ozoma immediately notified Pinterest leaders Deputy General Counsel Anthony Falzone ("Falzone"), Charlie Hale, and Jud Hoffman, but they refused to respond to Ozoma.

146.    As the team was making decisions, those internal decisions were promptly

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

showing up in LiveAction tweets and articles — making it obvious that someone was leaking information, but Falzone kept denigrating Ozoma, saying there was no evidence of a leaker within Pinterest and no serious risk to any Pinterest employee's safety.

147.   Then, LiveAction started publishing articles containing screenshots of Slack conversations of Pinterest employees, which revealed personal identifying information. Ozoma and Banks warned that this created a safety risk to individual Pinterest employees who would likely be targeted for "doxxing." Doxxing is a cyberattack wherein an individual's identity, contact information, and other personal information is posted publicly.  Swarms of people then engage in cyber-bullying and, terrifyingly, sometimes also cross over to in-person harassment.  Doxxing in its most vicious forms involves threats of physical and sexual violence, typically against women, particularly women of color.  Ozoma and Banks promptly sent emails to Pinterest leadership — including Flores and Falzone — warning that harassment was imminent, and that Pinterest needed to set alerts and protection for the Trust and Safety team. They made this request based on the experiences of friends employed at Google and Twitter who had experienced doxxing threats themselves.

148.   Ozoma urged the Company to do something, but Pinterest leadership again refused to acknowledge any threat.  Beyond employee warnings, Pinterest had reason to know of the threat to its employees as these threats were made publicly via Twitter.  On June 11, 2019, LiveAction tweeted that Pinterest had banned it from the platform and at least one follower promptly responded "Start doxxing Pinterest execs."

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1
2
3
4
5
6
7
8
9
10
11
12
13



14   149.   But because of Pinterest's racial and gender bias against Ozoma and Banks,

15   these credible threats were not addressed.  Flores and Pinterest ignored their concerns and

16   failed to take prompt action to protect Pinterest employees from doxxing and ensure their

17   immediate physical safety.

18   150.   This failure to act in the face of a threat of harassment against employees who

19   were acting on their employer's behalf constitutes a tacit endorsement of the harassment, in

20   violation of employment laws.

21   151.   Just as Ozoma and Banks warned, Project Veritas released a video that

22   disclosed Ozoma's photo, address, and phone number and wrongly attacked her as the

23   architect of a biased policy.  The video was quickly shared on websites including extremist

24   forums, 8chan and 4chan, where users organize harassment campaigns.

25   152.   Ozoma suggested looking into creating an advisory warning for content from

26   conservative media personality Ben Shapiro, whom she described as "a White supremacist."

27   This angered Shapiro's supporters, who now had access to Ozoma's photo and contact

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

information.  Within minutes, a host of racist, bigoted comments began to appear in the video, published to YouTube and Facebook. Ozoma, watching the comments pour in, emailed her team to ask if Pinterest had a plan to protect staff.  Hours elapsed, and she made the request again: "Can someone please let us know what [our] security options are?" she wrote in an email to the policy, safety and security, and legal teams.

153.    Ozoma thereafter received death and rape threats.  At least two other female Pinterest employees were also doxxed.

154.    Several hours later, a representative from Pinterest's legal team asked Ozoma to reach out to a third-party company named Storyful, which she had worked with on health misinformation, to ask whether they could "help advise" on what to do. Pinterest's Legal department then asked Storyful to investigate whether Shapiro actually was a White supremacist. Ozoma later expressed appropriate shock at this decision: "Instead of focusing on security and making sure that we were fine and validating the concerns that we had, their concern was: Is what you said valid? Almost like [the employee] had a legitimate reason to share my personal information all over the Internet."

155.    Ozoma shared her disappointment in Pinterest's handling of the situation in an email exchange with Silbermann the day she was doxxed, including screen images of the harassment she received.  Silbermann responded, "I'm personally concerned that when these risks were raised, we didn't take the right steps."  He promised to ask his deputies to look into the matter, but then did nothing. Ozoma received no follow-up from Silbermann nor any other Pinterest executive.

156.    For over a week, Pinterest failed to undertake any meaningful steps to try to scrub its employees' personal information from the Internet.  Ozoma had to reach out to friends at Facebook and Google for help because Pinterest refused to act promptly.

157.    The Defendants' refusal to act in response to a known threat to its employees was a tacit endorsement of harassment.

158.    Ozoma and Banks continued to raise concerns over the ensuing months, both internally and outside Pinterest regarding pay equity and other discriminatory treatment. In July 2019, after over a year of unsuccessful efforts to negotiate a pay increase even with the help of her outside attorney, Ozoma filed a complaint against Pinterest with the California Department of Fair Employment and Housing.  Under California Department of Fair Employment and Housing regulations that complaint was served on the Company within 60 days, and likely within 10 days.

159.    In September 2019, Banks raised concerns to Pinterest's HR department about Hale's discriminatory behavior, including that he had made racially charged comments about her ethnic background and criticized her "tone" — a common, biased criticism of women of color.  In raising her concerns, Banks asked that Hale be provided with coaching. Although the HR department found that Hale had made the comments, they concluded that they did not qualify as biased comments because Hale did not have ill intent.  Instead, the HR Department just chalked it up to him being an inexperienced manager.  Thus, Hale was protected by being part of Silbermann's inner-circle and was not required to undertake any coaching or other corrective action.

160.    In October 2019, Banks asked Hale for information about the process by which she could be considered for promotion, in order to prepare herself for the upcoming performance and promotion review cycle.  Hale ignored her for weeks, and did not provide her any clear response in writing about the promotion process until she sought help from a member of the HR department.

161.    In November 2019, Pinterest employees learned that the Company was refusing to provide holiday pay for its contract employees — janitorial, security, and catering staff.  This was a change from the prior year, when the Company had provided holiday pay to contractors.  Employees learned this not from the Company, but rather from a news article.  Banks was concerned about this development and believed it was the wrong choice; she promptly conferred with the Company's federal government affairs consultants,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

who agreed with her and said the decision should be reversed. Banks, Ozoma, and Hale discussed the decision and agreed they should recommend that Pinterest reverse it.

162. But when it came time to actually raise the concern to Pinterest's Legal Department, Banks and Ozoma stood by the team's recommendation and Hale went silent. Their recommendation, led by Banks, was not well received. Flores sent Banks a berating email questioning her competence, told her the proposal had embarrassed an upper-level manager, asked whether she knew how to represent the Company in high-stakes issues, and stripped her of her responsibilities.

163. The Company ultimately did reverse its decision on contractor holiday pay, but Flores went out of her way to tell Banks that her advocacy played no role in the Company's reversal. Flores accused Banks of lying about whether she had actually discussed the issue with the government affairs consultants (despite Banks having emails reflecting those conversations). Further, despite the Company ultimately agreeing with her, Banks was demoted, received a negative performance review, and all conversations regarding her career path and promotion potential were halted.

164. Banks was also subjected to a two-hour interrogation on the process by which she made the recommendation. Banks was promised a recording of the interrogation, but never received it, never received any follow-up, and never learned of any findings.

165. Further, Flores led the Company in an aggressive interrogation into the media leak regarding contractor pay, as well as the recommendation to reverse that policy decision. Numerous employees who worked with Banks and Ozoma or had a good relationship with them, were interrogated. Members of Pinterest's Business Conduct Team, including members of the Legal Department, confiscated employees' phones and personal devices, poured over their social media accounts, and repeatedly asked whether Ozoma leaked the information. It was obvious that the Business Conduct Team was focused on Ozoma and Banks because they accidentally forwarded to Banks their screenshots of other employees' social media conversations with Ozoma and Banks.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

166.    Pinterest employees felt the investigation's goal was to frame Ozoma and further retaliate against Ozoma for raising pay equity and discrimination claims. Notably, this investigation commenced just a week after Ozoma communicated to the Company her willingness to take her pay discrimination concerns to court.

167.    At the same time that Ozoma was being accused by the Company of leaking information, and while Pinterest was conducting an investigation intended to frame her, she continued performing her job in a valuable and competent manner.  In response to a request from Color of Change, Ozoma ended the promotion of slave plantations as wedding venues on Pinterest.  Color of Change had informed Ozoma that slave plantation weddings were trending on Pinterest and to request that the Company stop promoting plantations as sites for modern-day celebrations.  Ozoma brought that recommendation to her team, and after two months, the Company agreed to stop promoting slave plantations.  That decision resulted in another extremely positive news cycle for Pinterest, with dozens of positive stories.

168.    Pinterest benefitted from the policies that Ozoma championed and from having a woman of color as a public spokesperson.  Pinterest advertised Ozoma's policies as part of the Company's progress, specifically in the areas of diversity and inclusion.   In January 2020, Pinterest's Chief Human Resources Officer wrote:

> We can feel the impact of a more representative workforce, not just across our teams but also in product and policy decisions … We regularly look for and limit content that could make people feel unwelcome and unsafe. We also work with outside organizations to ensure our policies are equitable and comprehensive. For instance, we limited the distribution of wedding venues that were former slave plantations.[26]

169.    Nonetheless, that same month, Ozoma received a negative performance review at the Company.  This retaliatory review came one year and three months after she

---

[26] Available at https://newsroom.pinterest.com/en/post/diversity-report-2020, last visited Dec. 15, 2020.

first complained about unequal pay.  The criticism was connected to her recommendation that Pinterest stop promoting slave plantations as wedding venues.  Though the Company agreed, and instituted the policy, Hale criticized her for not exploring both sides of the issue and presenting the positives of highlighting plantations as a great location for a wedding.  According to Ozoma, "[i]t was mind-boggling, almost like trying to search for things to criticize me for in my performance review, and performance reviews that affect your pay."

170.   In January 2020, seeing no progress in correcting the under-leveling and amidst Pinterest's retaliation campaign, Banks filed a complaint with the California Department of Fair Employment and Housing alleging pay discrimination based on sex and race as well as retaliation for reporting the discrimination. She received the right to sue in February 2020.

171.   Banks was subjected to continued retaliation.   Although her job responsibilities included acting as a community-builder in Washington D.C., and she was hired specifically because of her strong relationships in the Black community, the Company scrutinized and rejected expenditures related to her partnerships with Black-owned organizations and businesses (but not with other organizations).  Charges that normally would not be reviewed were questioned.  When Banks submitted lunch receipts, she was quizzed on whether she actually went to lunch.

172.   After enduring repeated acts of discrimination and retaliation, Ozoma and Banks decided to leave Pinterest, with a common last day of May 22, 2020.

173.   Just days later, in response to George Floyd's death at the hands of a Minneapolis police officer and a renewed national focus on racism in America, Pinterest issued a public statement claiming: "With everything we do, we will make it clear that our Black employees matter, Black Pinners and creators matter, and Black Lives matter."

174.   Outraged at the hypocrisy of Pinterest claiming support for its Black employees and burnishing its own reputation as a diverse and inclusive workplace, Ozoma and Banks went public with their stories.

175. On June 15, 2020, Ozoma and Banks published lengthy threads on Twitter detailing their experience of discrimination at Pinterest, alleging that Pinterest underpaid them; that Pinterest tacitly endorsed Ozoma's harassment after being warned that a White male colleague shared Ozoma's cell number, photo, and name with a right-wing extremist group and claimed it was no big deal; and, that Pinterest retaliated against both for speaking up about discrimination at the Company. Ozoma reported that Pinterest's assigning them to improper pay levels resulted in the loss of stock options worth hundreds of thousands of dollars.

176. Their posts included the following indictments of Pinterest and its leadership:



**Aerica Shimizu Banks** @erikashimizu · Jun 15

What should have been a moment of pride and the beginning of a long journey achieving federal and social impact wins for the company, Pinners, and the communities it serves instead marked a period of glaringly unfair pay, intense discrimination, and terrifying retaliation. 3/

  💬 1    🔁 26    ♡ 185    ↑



**Ifeoma Ozoma** @IfeomaOzoma · Jun 15   ooo

Replying to @IfeomaOzoma

I am SO proud of the initiatives I led in my time there - addressing health misinfo decisively is no longer novel thanks to that work. I just wish it wasn't sullied by the racism, gaslighting, & disrespect from my manager, skip level, and the company's legal & HR leadership. 7/

  💬 11    🔁 208    ♡ 2.7K    ↑

**Ifeoma Ozoma** @IfeomaOzoma · Jun 15   ooo

Racism is dehumanizing and exhausting. I busted my ass at Yale, Google, then Facebook before Pinterest recruited me as the *second hire* on the global Public Policy team. I led work that raised our public policy profile globally. It didn't matter because I'm a Black woman. 8/

  💬 9    🔁 270    ♡ 2.7K    ↑

177. Their posts were shared thousands of times, including by high-profile celebrities like Lady Gaga, and received sympathetic responses from others who had

46

experienced discrimination at Pinterest, including one individual who tweeted, "I left pinterest a long time ago due to the racist vitriol."

178.    Hours after Ozoma and Banks came forward, in an effort to cover-up Pinterest's mistreatment of Ozoma and Banks, Silbermann sent Pinterest employees an email disputing the women's claims without mentioning their names and claiming "[t]he investigations found that we treated these employees fairly."  Silbermann failed to tell employees that the same people accused of retaliating against them were also taking the lead on those investigations.

179.    Ozoma and Banks' stories received swift and extensive media coverage, including numerous articles corroborating their stories and those of other current and former employees at Pinterest who alleged discrimination on the basis of race and/or gender, retaliation, and harassment.

180.    That day, Color of Change issued a nationwide statement entitled Pinterest's Hypocrisy is Glaring in which the organization highlighted its work with Ozoma and Banks to restrict the marketing of plantation weddings on Pinterest and to overhaul the Company's anti-harassment policies, and indicting Pinterest's failure to treat these valuable employees equally. "We credit them for orienting the company's policies toward racial justice. However, even while claiming 'Black lives matter,' Pinterest sidelined Ifeoma and Aerica after they made the platform safer for Black users. To make matters worse, the company's leadership failed to intervene after Ifeoma was doxxed by another Pinterest employee."

181.    On June 16, 2020, The Washington Post published an article entitled, "Two former Pinterest employees allege racial discrimination at the company" and noted that Pinterest's most recent diversity report stated that only 4% of Pinterest employees are Black, and Black people comprise only 1% of its leadership.

182.    A June 20, 2020 Business Insider article interviewed eleven former employees who all indicted Pinterest and its executives.  Former employees said Pinterest has a "dog-

eat-dog culture that they believe goes well beyond the 'brilliant jerk' standard that's accepted at many Silicon Valley companies."  Employees described feeling "duped" because the Pinterest product is so friendly and the Company's motto is "the last positive corner on the internet" but in reality, the Company has a "toxic, chaotic culture" where:

- "People, especially Black employees, were suddenly fired or 'pushed out' after meeting or exceeding their performance goals.'"

- "Poor management skills created a culture of firing that left everyone fighting for recognition. Internal teams felt pitted against each other, taking credit for each others' work."

- "Multiple people said they suffered stress-induced conditions. Some said they required medical treatment ranging from 'stroke level' high blood pressure to clinical depression and PTSD."

- "Many women believed they were underpaid compared to what male coworkers were earning."

- "When complaints were made to human resources, HR routinely sided with managers, multiple people said. Those employees then often received negative reviews, despite meeting performance goals, while managers were promoted, they said."

- Complaints "went into the garbage" and when they reached out to follow-up on previous reports or file new ones, were assigned to new HR representatives with no knowledge of previous complaints

183.    Pinterest was described as a "revolving door" for people of color, with eight Black former employees in a variety of jobs across the Company all of whom left within two years and many reporting discriminatory and inappropriate treatment:

- A Black male former salesperson said he was "pushed out" in late 2019; he brought in 8 million dollars in sales from a high-profile client and then had the account reassigned to a White male, got cut from meetings, and received a bad review.

- Another Black male former salesperson similarly hit or exceeded his sales goals (which were higher than others on his team) and received positive feedback, but then was called in and suddenly fired one day. He went to HR twice and never got a reason for the termination.

- An experienced Black saleswoman was singled out by her White manager to the point that others noted it; her manager criticized her performance in front of the team and accused her of taking more time off than other workers because she was a mother. The employee spoke to HR several times and suggested her manager receive training, but HR backed the manager and said she should try to handle it herself. After meeting her sales goals but nonetheless receiving a bad review, she was put on a performance plan and fired 4 weeks after the plan ended.

- One Black female executive assistant was assigned to a White female manager who immediately forced her to do personal chores like pay parking tickets and make doctors' appointments. When the manager had a urinary tract infection, she blamed it on her assistant failing to schedule her breaks.

184.    In the face of this public scrutiny and concern, on June 22, 2020, Pinterest changed its tune from its initial confidence in the fairness of its investigation and treatment of Ozoma and Banks, with Silbermann suddenly conceding his wrongdoing, writing that he had learned that "parts of our culture are broken," expressed "I'm truly sorry for letting you down," and claimed, "I'm embarrassed to say that I didn't understand the depth of the hardship and hurt many of our team members have experienced.  I need to do better."

185.    On June 23, 2020, NPR covered the story as part of a special series America Reckons with Racial Injustice. The article quoted Ozoma, speaking about Pinterest's refusal to protect her from online harassment, with a particularly poignant phrase in the context of the social moment: "Our Black lives were treated like they didn't matter."  In legal terms, Pinterest tacitly endorsed the harassment of its own employees.

186.    On July 2, 2020, Ozoma and Banks were invited to the Today Show to share their stories. Banks shared the personal toll her time at Pinterest had taken on her, including that she was forced to take anti-anxiety and anti-depression medication.  They also shared that each of their California Department of Fair Employment and Housing claims had

resolved under confidential terms.

187.    On a July 2, 2020, Tech Freedom Policy podcast, Banks described the strong contrast between her prior roles and Pinterest.  At Google she had an incredible experience pointing out where that company could do better.  At the White House under President Barack Obama it was the most stressful but rewarding job she could have.  But at Pinterest it was "the most unethical, most hypocritical, and most unprofessional environment I've ever been in in my life."

188.    On that podcast, Banks emphasized the structural problems within Pinterest. The public policy and social impact team, of which she and Ozoma were members, was within the Legal organization, so her manager (Hale) was managed by the General Counsel (Flores).  But even though Banks and Ozoma's discrimination and retaliation claims implicated their own business unit, those same individuals within the same management chain oversaw the purported investigations, rendering the investigations conflicted and biased.

189.    Ozoma also succinctly captured part of the harm to the Company caused by its discriminatory actions, explaining that her concern with her treatment and similar treatment of others at Pinterest was the loss of talent and its impact on the Company's long-term value.  She likened this scandal to the sort of situation that could result in a lost financial opportunity as occurred in July 2020 when a number of advertisers pulled funds from Facebook out of concern about misinformation on that platform.  Had Pinterest not had its own scandal, it could have reached out to each of those ad agencies to invite them to spend those funds at Pinterest, a company that was more in line with their values — but because the news story about Pinterest in that moment was its egregious discrimination against Black women, the Company was not in a position to fully capture those advertising dollars.

190.    On July 4, 2020, Nitasha Tiku at The Washington Post wrote, "Black women say Pinterest created a den of discrimination — despite its image as the nicest company in

tech." The article offered an in-depth profile of Ozoma and Banks' experience at Pinterest, as well as the outrage it had sparked within the Company, including over one hundred questions submitted in advance of a mid-June Company-wide Q&A gathering.  Based on Tiku's investigation including speaking with former employees and reviewing correspondence and other documents, the article also reported discriminatory experiences by numerous former employees.  Tiku reported a marketing executive telling a Black employee that it was surprising that marketing materials depicting Black people were successful and a supervisor telling a Black female employee to stop speaking in meetings and taking her presentations to present to clients.  The article also shared the story of a former employee who was the only Black employee on her team and went to a team dinner where a Pinterest executive said this sole Black person should act as "the servant" and "serve" her co-workers.  "Everyone knew it was wrong, but nobody said anything in that moment," said the ex-employee, who said she was too scared of retaliation to report the incident to Human Resources.

191.   On July 20, 2020, Fast Company, the country's most widely read tech magazine, published a story entitled "Discrimination charges at Pinterest reveal a hidden Silicon Valley hiring problem".  The article put Pinterest's discrimination in context of a tech industry where discriminatory under-leveling means "you never catch up" and the racial wage gap particularly punishes Black women.  In particular, the article noted that Pinterest's pay level charts were neither transparent nor objective, wholly undermining the Company's supposed meritocracy.

192.   Then, on August 11, 2020, as indicated *supra*, Francoise Brougher filed a lawsuit in the Superior Court of the State of California alleging discrimination and retaliation against Pinterest.

193.   The Individual Defendants have concealed significant additional instances of gender and racial discrimination and unlawful retaliation at Pinterest through mandatory non-disclosure agreements which preclude former employees from revealing the unlawful

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

conduct.   Brougher criticized the Company's use of non-disclosure agreements in her August 11, 2020 article, in which she stated "Don't use NDA's to buy silence." In a CNBC interview that day, she disclosed that she was asked by Silbermann to tell her team that she was leaving by choice and to sign a non-disclosure agreement. Brougher refused, explaining, "I was not going to lie to my team and did not sign the NDA presented to me … I realized it was more important to finally be an advocate for women at Pinterest, and for anyone else experiencing the pernicious effects of sexism, bias, and retaliation."

### D. Pinterest's Compensation Committee Breached Its Duties by Awarding Large Equity Grants that Were Not Tethered in Any Way to Executives' Compliance with Laws Prohibiting Discrimination

194.   Compensation practices are key policies affecting risk.  If an executive is provided with too much compensation with no (or too little) strings attached, the executive will view it as economically rational behavior to maximize his own compensation at the expense of the Company, especially given the extremely wide and employee-friendly indemnification policies that require the Company to indemnify the executive against any and all legal fees and judgments.  To avoid significant legal exposure, fines, penalties, reputational harm, and other damage to the company, compensation policies therefore must ensure legal compliance by the executive and provide for clawbacks of the compensation and termination of employment when an employee engages in unlawful and/or socially unacceptable behavior.

195.   At Pinterest, executive compensation policies and the actual award of compensation to senior executives is made directly by the Board.  The Board directly enabled the unlawful sexual harassment and discrimination at Pinterest, including that of Defendant Morgenfeld (the Company's CFO) by providing massive stock grants without any material countervailing checks and balances.  Morgenfeld was thus left free to engage in unlawful conduct and other aggressive conduct in pursuit of massive wealth for himself, without regard to the commensurate massive liability that might be caused to Pinterest by his unlawful, demeaning conduct.

196.     At a company like Pinterest, whose main audience is women, Morgenfeld's conduct obviously posed irreparable harm to Pinterest's image, its advertising revenues and user base, and its future prospects, not to mention major legal liability that the Company would be forced to cover due to Morgenfeld's indemnification rights.

197.     Defendants Wilson (Chair) and Kilgore are the members of Pinterest's Compensation Committee.  The Company's 2020 Proxy Statement indicated the following with respect to the Committee's responsibilities:

> The compensation committee performs the responsibilities of the board relating to the compensation of the non-employee members of the board and our executive officers. The compensation committee has overall responsibility for reviewing our compensation philosophy and strategy, overseeing our compensation and benefits policies generally, and overseeing and evaluating the compensation plans, policies, and practices applicable to our CEO as well as our other executive officers.

198.     The Compensation Committee's Charter also states that:

> "*Incentive Compensation*. In determining incentive compensation for the CEO and other executive officers, the Committee will consider, among other factors it deems appropriate from time to time, Pinterest's performance during such periods as the Committee deems appropriate and the awards given in prior years. The Committee will make recommendations to the Board for the establishment and terms of incentive-compensation and equity-based plans and will administer such plans, including determining awards for directors or executive officers under any such plan."

199.     In response to a shareholder inspection demand from Plaintiff, Pinterest also produced minutes of the Compensation Committee meetings.  A review of these documents as well as the publicly-available documents and Company Corporate Governance documents reveals that Pinterest does not appear to place any emphasis or weight on an executive's compliance (or lack thereof) with laws and regulations, including those prohibiting sexual harassment and discrimination.

200.     Thus, Pinterest's Board has approved huge equity grants to the Company's senior executives without any demand or requirement that the executives comply with the law in order to receive the compensation.

201.     For example, in 2019 Defendants Silbermann and Sharp received stock grants

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

valued at over $45 million, and in 2018 Defendant Morgenfeld received a stock grant valued

at over $22 million:

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($)[1] | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|
| **Benjamin Silbermann**<br>Co-Founder, President & CEO | 2019 | 197,100 | — | 45,745,013 | 280,000[2] | 46,222,113 |
| | 2018 | 197,100 | — | — | — | 197,100 |
| **Ethan Sharp**<br>Co-Founder, Chief Creative & Design Officer | 2019 | 330,000 | — | 45,745,013 | — | 46,075,013 |
| **Françoise Brougher**<br>Chief Operating Officer | 2019 | 309,545 | 75,000[3] | 21,352,493 | — | 21,737,038 |
| **Christine Flores**<br>General Counsel and Corporate Secretary | 2019 | 345,000 | — | — | — | 345,000 |
| **Todd Morgenfeld**<br>Chief Financial Officer | 2019 | 360,500 | — | — | — | 360,500 |
| | 2018 | 360,500 | — | 22,028,696 | — | 22,389,196 |

202.    When the Board approved these massive stock grants, however, it did not tie

them in any way to legal compliance.   The Company's 2020 Proxy Statement does not

indicate in any way that the stock grants are tied to legal compliance.   Instead, it simply

states that:

> Benjamin Silbermann and Evan Sharp received RSU awards each with a
> grant date fair value of $45.7 million which vest over five years as
> described under the "2019 Grants of Plan-Based Awards Table" below.
> These were special, one-time "Founder's" awards granted by the board in
> advance of our IPO after considering both their past individual
> performance, expected future contributions, continued importance to
> driving the growth of our business and the achievement of our long-term
> mission and strategy.

203.    The Company's Board minutes and its production of documents in response

to Plaintiff's shareholder inspection demand indicate that the Company's



VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



204.

205.

206.

27 *See* ▮.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ██████████████████████████.

5     208.    Pinterest also has a Harassment and Discrimination Policy,[28] but it is not

6 mentioned anywhere in any of the Company's internal documents discussing its

7 compensation policies and principles, nor is compliance with the Harassment and

8 Discrimination Policy tied in any way to compensation decisions.

9     209.  ████████████████████████████████████

10 ████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████

16 ███████████████████████████    █████████████████████

17 ████████████████████████████████████████████████████

18 ████████████████████████████████.

19     210.  ████████████████████████████████████

20 ██████████████████████    ██████████████████████████

21 ████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████

24

25 _____

[28] *See* ████████████████████.

26 [29] *See* ████████████████.

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  ██████████████ ██ ████████████████████████████████████████████

2  ███████████████████████████████████████████████████████████████

3  █████████████████████████████

4      211.  ███████████████████████████████████████████████

5  ███████████████████████████████████████████████████████████████

6  ███████████████████████████████████████████████████████████████

7  ███████████████████████████████████████████████████████████████

8  ███████████████████████████████████████████████████████████████

9  ███████████████████████████████████████████████████████████████

10 ███████████████████████████████████████████████████████████████

11 ███████████████████████████████████████████████████████████████

12 ███████████████████████████████████████████████████████████████

13 ███████████████████████████████████████████████████████████████

14 ███████████████████████████████████████████████████████████████

15 ███████████████████████████████████████████████████████████████

16 ███████████████████████████████████████████████████████████████

17 ███████████████████████████████████████████████████████████████

18 ███████████████████████████████████████████████████████████████

19 ████████████████████████

20     212.  ████████████████████████████████████████████

21 ██████████████████████████████████████████, the Board breached

22 its fiduciary duties and failed to implement an effective system of oversight over

23 management.   This failure allowed executives such as Morgenfeld to engage in sexual

24 harassment/discrimination of female employees such as Brougher.

---

25 [30] *See* ████████████████.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### E. False and Misleading Statements Made by the Director Defendants in Pinterest's 2020 Proxy Statement

213.     The Director Defendants also caused Pinterest to make false statements about the relevant issues in Pinterest's 2020 Proxy Statement which was filed with the SEC on April 9, 2020 and approved by Directors Jordan, Levine, Rajaram, Reynolds, Sharp, Wilson, Kilgore and Silbermann.   The Proxy Statement solicited stockholders to (1) elect Jordan, Levine and Rajaram to terms on the Board of Directors and (2) approve, on an advisory basis, the timing of future advisory votes to approve compensation for certain executives.

214.     In the 2020 Proxy Statement, the Directors included the following representation that Defendant Silbermann, despite not being independent, was ensuring that the Board was exercising effective oversight of management:

**Board Leadership Structure**

***Our Co-Founder, President and CEO, Benjamin Silbermann, currently serves as chairman of the board***, and the board has appointed an independent director, Michelle Wilson, to serve as lead independent director. ***Although our bylaws do not require that the positions of chairman and CEO be combined, we believe that this structure is in the best interest of our company given Mr. Silbermann's deep understanding of our business and culture, as well as his leadership in shaping and driving the company's strategic priorities and business plans***. This structure also facilitates a regular flow of information between management and the board and provides a clear chain of command. Our chairman, amongst other things:

- presides over meetings of the board;

- consults with the lead independent director on the agenda for board meetings;

- consults, as needed, on evaluating and recommending candidates for election to the board; and

- oversees the activities of the board**.**

In addition, our corporate governance guidelines provide that one of our independent directors should serve as our lead independent director at any time when our chief executive officer serves as the chairman or if the chairman is not otherwise independent. ***We have structured the lead independent director role in a manner that reinforces the independence of the board and serves as an effective balance to a combined chair and CEO***.

215.     The 2020 Proxy Statement also stated:

58

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Board's Role in Risk Oversight**

Our board is responsible for overseeing how we manage risk at Pinterest. This is carried out both at the full board level and through each of the standing committees. The board and each committee meet periodically with senior management to review risk oversight matters and periodically receive reports from management on these matters. The full board is responsible for monitoring and assessing strategic risk exposure, including determining the nature and level of risk appropriate for the company, and the committees are responsible for monitoring and assessing risks inherent in their respective oversight functions as follows:

- The audit committee oversees our enterprise risk management program and significant financial risk exposures and certain legal, regulatory and operational risk exposures, including with respect to information security, data protection and privacy.

- The compensation committee oversees significant compensation and other employee-related risk exposures, including risks and exposures associated with leadership assessment, management succession planning, and executive compensation programs and arrangements, including incentive plans.

- The governance committee oversees significant governance risk exposures, including, with respect to corporate governance, board effectiveness and board succession planning.

216.    The 2020 Proxy also contained a "Say on Pay" proposal that the Company requested shareholders to vote in favor of. The Proxy Statement misled investors regarding Pinterest's compensation system and the efficacy of oversight for that process. In support of that proposal, the Proxy stated:

**Compensation Philosophy and Program**

**Objectives**. Our executive compensation program is guided by these objectives:

- Drive achievement of Pinterest's long-term mission;

- Motivate team collaboration (company first, individual function second);

- Attract and retain top talent by compensating competitively based on the executive's market value and performance; and

- Align the interests of our executives with those of our stockholders.

**Framework**. To achieve these objectives, our executive compensation program has two compensation elements: base salary and long-term equity incentive compensation. In addition, our NEOs are eligible to participate in

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

the standard benefit plans offered to our other employees, and are eligible for post-employment compensation in certain situations as described below. We generally do not provide our NEOs with perquisites or other personal benefits and do not have any defined benefit pension, supplemental executive retirement or nonqualified deferred compensation plans.

**Pay mix**. The majority of our executive compensation is delivered in the form of equity awards. For details, see "Summary Compensation Table" below. We believe that equity compensation in the form of restricted stock unit ("RSU") awards vesting over at least four years effectively supports all of our compensation objectives, including achievement of our long-term mission, motivating and paying for team and company performance, and aligning our executives' interests with those of our stockholders.

**Linking pay with performance**. As described above, the majority of our NEOs' target total direct compensation is linked to the value of our stock, which will reflect how we create value over the long term. In addition, executives are eligible to receive periodic grants following the annual review cycle. When determining the amount of such awards, the compensation committee considers the company's performance as measured against financial, operational and strategic objectives as well as each named executive officer's individual contribution to that performance.

**Governance.** We endeavor to maintain sound governance standards through the administration of our executive compensation program. The following table summarizes our compensation governance policies and practices.

217.    The Proxy also stated that, when awarding compensation, the Compensation Committee considers "each of our named executive officer's roles and responsibilities, qualifications, knowledge, skills, experience, and tenure, including on a relative basis to other similarly situated executives at the companies in our compensation peer group" and that "the performance of each of our named executive officers, based on a qualitative assessment of his or her contributions to our overall performance, ability to lead his or her business unit or function, ability to collaborate across the company and potential to contribute to our long-term financial, operational and strategic objectives."

218.    The proposal in the 2020 Proxy Statement regarding executive compensation was also false and misleading because the proxy failed to disclose that the executives' achievement of performance goals was based in part on unlawful and discriminatory hiring, promotion, and pay practices.  The compensation plans gave Defendants a strong incentive

to continue concealing the true nature of the Company's discriminatory practices in order to boost the Company's reported financial performance and achieve the performance measures such as earnings, financial return ratios, net income, and stock price, for which they could be awarded bonuses.

219.   The 2020 Proxy also stated:

**Board Diversity**

Our board is composed of a diverse group of individuals, with varied experience and skills relevant to our company. Many of the directors have senior leadership experience at major U.S. and international companies. In these positions, they have also gained experience in areas, such as management, financial planning, public company governance, sales and marketing and international business. Many of our directors have experience serving on boards and board committees of other public companies, and have an understanding of corporate governance practices and trends and different business processes, challenges and strategies. Further, our directors also have other experience that makes them valuable members of the board, including experience in established or growing technology companies.

The diversity, skills and experiences of our directors as described below, provide us with a diverse range of perspectives and judgment necessary to guide our strategies and monitor their execution.

The following charts reflect the age, gender and independence of the members of our board:



220.   As to Brougher, the Proxy Statement explained that she received a Restricted Stock Unit ("RSU") award in 2019 and that the Board, in granting the RSU, had considered "her past performance, expected future contributions and the criticality of her role to Pinterest, and expected contributions, as well as the total unrealized value of her

61

outstanding equity awards and their vesting terms relative to our compensation peer group data and other Pinterest executives."

221.    These statements to Pinterest's stockholders were materially misleading, including due to the omission of material information. The statements omitted that the Compensation Committee had assigned Brougher's RSUs in an amount that discriminated on the basis of sex, was not fully reflective of her role, contributions and ability to contribute to Pinterest's long-term objectives, and that the decisions made to set her RSUs treated her unequally relative to her similarly situated male counterparts.

222.    The Proxy Statement also misled investors regarding Brougher's departure from the Company, stating that "Francoise Brougher left the Company effective April 7, 2020 and Todd Morgenfeld, our Chief Financial Officer, assumed her responsibilities."

223.    This statement was materially misleading, including due to the omission of the highly material fact that Silbermann terminated Brougher on the basis of her gender after she had challenged the Company's discriminatory pay practices and that both Silbermann and Morgenfeld had ostracized her in retaliation for making such a complaint.

224.    The 2020 Proxy Statement also contained proposals to retain Ernst & Young. The Proxy Statement represented that:

> The audit committee has sole responsibility for the appointment, compensation and oversight of our independent registered public accounting firm. At the annual meeting, you are being asked to ratify the audit committee's selection of Ernst & Young LLP ("EY") to serve as our independent auditor for the year ending December 31, 2020. EY has served as our independent auditor since 2013. ***The audit committee believes that the continued retention of EY as our independent auditor is in the best interests of Pinterest and its stockholders.*** Representatives of EY are expected to be present at the annual meeting. They will have an opportunity to make a statement if they desire to do so and are expected to be available to respond to appropriate stockholder questions.

225.    Pinterest's Audit Committee — Defendants Reynolds, Kilgore, and Wilson — were well aware that E&Y has served as the Company's auditor since 2013, which is a long time to have the same auditor, without rotation.  The Defendants were also well aware, as alleged herein, that rampant gender and ethnic discrimination was taking place at Pinterest

and that the Company's internal controls were not effective to prevent such discrimination. They also knew that it was E&Y's job to perform tests and analysis to determine whether management was complying with the Company's stated polices and internal controls, and that E&Y was failing to do so and was blindly deferring to Silbermann, Sharp, and the Company's other controlling insiders. The Director Defendants thus knew that the Company would benefit from a rotation of E&Y, yet falsely stated in the 2020 Proxy Statement that "retention of EY as our independent auditor is in the best interests of Pinterest and its stockholder."

226. The Proxy also stated that the Audit Committee members had "reviewed and discussed with management the audited financial statements for the fiscal year ended December 31, 2019. The audit committee has discussed with EY, our independent registered public accounting firm, the matters required to be discussed by the applicable requirements of the Public Company Accounting Oversight Board ("PCAOB"), including Auditing Standard No. 1301, Communications with Audit Committees, as adopted by the PCAOB, and the SEC. The audit committee has also received the written disclosures and the letter from EY required by applicable requirements of the PCAOB regarding the firm's communications with the audit committee concerning independence and has discussed with EY the firm's independence. Based on the foregoing, the audit committee has recommended to the board that the audited financial statements be included in our 2019 annual report on Form 10-K." The Proxy thus contained a representation that the Audit Committee members had discussed the effectiveness of the Company's internal controls with E&Y and had determined that the controls were effective.

227. This was false. As the Audit Committee members knew, as of the date the Proxy was filed with the SEC on April 9, 2020, the Audit Committee had already received a

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

███████████████████████████████████████████████.[31]

**F.   The Directors' Roles and Committees at Pinterest**

228.   The following chart lists the directors of Pinterest as set forth in the Company's most recent Proxy Statement and the committees on which they serve:

| Name | Class | Age | Director since | Term Expires in | Principal Occupation | Other Public Company Boards | Our Committee Membership |
|------|-------|-----|----------------|-----------------|----------------------|-----------------------------|--------------------------|
| Jeffrey Jordan | I | 61 | 2011 | 2020 | Managing Partner, Andreessen Horowitz | None | Governance Committee (member) |
| Leslie Kilgore | III | 54 | 2019 | 2022 | Former Chief Marketing Officer, Netflix, Inc. | Netflix, Inc.; Medallia, Inc. | Compensation Committee (member); Audit Committee (member) |
| Jeremy Levine | I | 46 | 2011 | 2020 | Partner, Bessemer Venture Partners | Shopify Inc. | Governance Committee (chair) |
| Gokul Rajaram | I | 45 | 2020 | 2020 | Caviar Lead, DoorDash Inc. | The Trade Desk Inc. | Governance Committee (member) |
| Fredric Reynolds | II | 69 | 2017 | 2021 | Former EVP & CFO, CBS Corporation | Mondelez International, Inc.; United Technologies Corporation | Audit Committee (chair) |
| Evan Sharp | II | 37 | 2019 | 2021 | Co-Founder, Chief Design & Creative Officer, Pinterest, Inc. | None | None |
| Benjamin Silbermann | III | 37 | 2011 | 2022 | Co-Founder, Chairman, President & CEO, Pinterest, Inc. | None | None |
| Michelle Wilson* | II | 57 | 2016 | 2021 | Former SVP & General Counsel, Amazon.com, Inc. | Okta, Inc.; Zendesk Inc. | Compensation Committee (chair); Audit Committee (member) |

•    Lead Independent Director

---

[31] *See* ███████████████████.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**G. The Director Defendants Breached Their Duties of Loyalty and Good Faith by Failing to Take Action in Response to the Rampant Reports of Gender and Ethnic Discrimination at the Company**

229. The Director Defendants have known for years that Pinterest has lacked adequate internal controls to prevent racial and ethnic discrimination at the Company, and that the diversity that the Company trumpets among employees is false because of such discrimination, including pay discrimination.

230. Defendants' knowledge is reflected by the facts alleged herein, including the facts obtained from the internal, non-public documents produced by Pinterest in response to Plaintiff's shareholder inspection demand.

**H. The Unjust Compensation Awarded to the Individual Defendants**

231. Some of the Defendants received unjust compensation and/or compensation and payments that were higher due to Defendants' wrongdoing and because the Company was more profitable by paying women and minorities less.

232. The Individual Defendants' receipt of this compensation during the relevant time period was unjust in light of their direct participation in the wrongful conduct alleged herein, which constituted bad faith and disloyal conduct. The Defendants' receipt of such compensation while they were knowingly or recklessly breaching their fiduciary duties to the Company constitutes unjust compensation that should be recouped by Pinterest.

233. The following table provides additional information regarding some of the Officer Defendants' compensation during part of the relevant time period:

> The following table shows the compensation awarded or paid to, or earned by, Pinterest's named executive officers for 2019 and 2018, as applicable, in accordance with the SEC's transition rules for newly public companies.

///

///

///

///

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## 2019 Summary Compensation Table

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($)[1] | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|
| Benjamin Silbermann<br>Co-Founder, President & CEO | 2019 | 197,100 | — | 45,745,013 | 280,000[2] | 46,222,113 |
| | 2018 | 197,100 | — | — | — | 197,100 |
| Evan Sharp<br>Co-Founder, Chief Creative & Design Officer | 2019 | 330,000 | — | 45,745,013 | — | 46,075,013 |
| Christine Flores<br>General Counsel and Corporate Secretary | 2019 | 345,000 | — | — | — | 345,000 |
| Todd Morgenfeld<br>Chief Financial Officer | 2019 | 360,500 | — | — | — | 360,500 |
| | 2018 | 360,500 | — | 22,028,696 | — | 22,389,196 |

The following table shows information regarding the number and value of shares of common stock acquired during 2019 by Pinterest's named executive officers from the vesting of RSUs and exercise of stock options.

### 2019 Option Exercises and Stock Vested Table

| Name | Option Award Exercises | | Stock Award Vestings | |
|---|---|---|---|---|
| | Shares Acquired (#) | Value Realized ($)[2] | Shares Acquired (#)[1] | Value Realized ($)[3] |
| Benjamin Silbermann | 399,000 | 7,128,933 | 991,666 | 25,390,144 |
| Evan Sharp | — | — | 566,666 | 15,123,278 |
| Françoise Brougher | — | — | 412,499 | 11,077,475 |
| Christine Flores | — | — | 422,922 | 10,958,387 |
| Todd Morgenfeld | — | — | 929,175 | 23,642,025 |

234.    The Proxy was also misleading because it failed to provide information about median employee compensation and how such compensation compared to CEO Silbermann's compensation, in violation of Item 402(u) of SEC Regulation S-K.  The 2019 compensation of Pinterest's CEO was obviously thousands of times higher than the median employee's compensation.

235.    When viewed in light of these facts, the Defendants' compensation was unjust under equitable principles.

236.    The following chart provides information about the compensation that the Director Defendants received during 2019:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**2019 Director Compensation Table**

| Name | Fees Earned or Paid in Cash ($) | Stock Awards ($)[1] | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|
| Jeffrey Jordan | 41,250 | 249,995 | — | 291,245 |
| Leslie Kilgore | 54,375 | 652,153 [2] | — | 706,528 |
| Jeremy Levine | 45,000 | 249,995 | — | 294,995 |
| Fredric Reynolds | 56,250 | 249,995 | — | 306,245 |
| Michelle Wilson | 76,875 | 249,995 | — | 326,870 |

237.    The Defendants' compensation and stock awards detailed herein were unjust and should be disgorged or returned by such Defendants because they acted in bad faith and in a disloyal manner by virtue of the conduct alleged in this complaint.

## VII.   THE COMPANY HAS SUFFERED SIGNIFICANT DAMAGES

238.    The Company has suffered significant harm and damages due to Defendants' wrongdoing and breaches of duties.

239.    As a direct and proximate result of the Individual Defendants' conduct, the Company has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to, the amounts paid to outside lawyers, accountants, and investigators in connection with internal and external investigations into issues pertaining to the discrimination at Pinterest, discrimination lawsuits, harassment claims, wrongful termination lawsuits, and lack of pay equity claims.

240.    Moreover, Pinterest's reputation, goodwill, and market capitalization have been harmed as a result of the Individual Defendants' misconduct.

241.    Further, as a direct and proximate result of the Individual Defendants' actions, Pinterest has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred from having to hire new employees, as employees have quit in protest over Defendants' misconduct and the discriminatory practices employed by Pinterest;

(b)    costs incurred from defending and paying settlements in discrimination lawsuits, since the Individual Defendants' wrongdoing caused discrimination to

67

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

proliferate at Pinterest; for example, the Company was recently forced to pay $22.5 million to settle Brougher's lawsuit;

(c)     costs incurred from defending and settling governmental investigations into the Individual Defendants' misconduct;

(d)     loss of reputation; and

(e)     costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to Pinterest.

## VIII.    DEMAND FUTILITY

242.     Plaintiff brings this action derivatively in the right and for the benefit of Pinterest to redress injuries suffered, and to be suffered, by Pinterest and its stockholders as a direct result of the Officer Defendants' violations of federal securities laws and breaches of fiduciary duties.

243.     Pinterest is named as a nominal defendant solely in a derivative capacity.

244.     This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

245.     At the time this action was commenced, Pinterest's Board consisted of the following members: Silbermann, Sharp, Jordan, Kilgore, Levine, Rajaram, Reynolds, Smith, Wilson and Wishom.  When, as here, a board is comprised of an even number of directors, a plaintiff need only allege that demand would be futile as to half the members.  As such, Plaintiff need only allege that five of the Company's ten directors are either interested or lack independence and objectivity in order to allege demand futility.

246.     Plaintiff has not made any demand on Pinterest to institute this action because such a demand would be a futile, wasteful, and useless act.

247.     As discussed below, demand is futile because (i) the Director Defendants face a substantial likelihood of liability for violating the federal securities laws and breaching their duties of loyalty and good faith; (ii) Silbermann and Sharp are controlling shareholders and are not independent; and (iii) at least three other directors are not independent of

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   Silbermann and Sharp.

2       **A.      Demand Is Futile Against Silbermann and Sharp**

3       248.    Silbermann and Sharp served as officers of Pinterest (and directors) during the

4   Relevant Period.  As officers, Silbermann and Sharp face a substantial likelihood of liability

5   if there is reason to doubt that they breached their duty of care — *i.e.*, acted with gross

6   negligence.

7       249.    As alleged above, Silbermann and Sharp directly participated in the process by

8   which discriminatory employment and pay practices were adopted and implemented at

9   Pinterest.  They also knowingly or recklessly made or disseminated materially false and

10  misleading statements regarding the Company's diversity, compensation practices, internal

11  controls, and other matters alleged in this complaint.  As such, Silbermann and Sharp face a

12  substantial likelihood of liability for violating their fiduciary duties of candor and good faith

13  and the federal proxy laws.

14      250.    Further, Defendant Silbermann is not independent because he is the President

15  and CEO of Pinterest; Sharp is not independent because he is the Chief Design and Creative

16  Officer.   The Company admits in its SEC filings that Silbermann and Sharp are not

17  independent. Moreover, a significant portion of Silbermann and Sharp's compensation is

18  incentive-based, which means that they are personally incentivized to perpetuate

19  misconduct (such as that described herein) that artificially inflates the performance of the

20  Company. In 2019 alone, Silbermann and Sharp each received RSUs worth $45,745,013, and

21  total compensation over $46 million.  As Company executives, they had exposure to and

22  knowledge of the wrongdoing alleged, including any "red flags." Silbermann and Sharp

23  cannot realistically distance themselves from the misconduct alleged herein. Silbermann

24  and Sharp are therefore incapable of impartially considering a demand to commence this

25  action.

26      251.    Demand is also futile as to Silbermann and Sharp because they are controlling

27  shareholders.  Silbermann controls 24.77% of the voting stock at the Company and Sharp

28

1   controls 4.82%.  In addition, they have voting agreements and other agreements with the

2   venture capital firms that provided seed capital for Pinterest and which still control large

3   blocks of stock.  Andreesen Horowitz controls 13.43% of the stock and Bessemer Ventures

4   controls 19.05%.  Silbermann, Sharp, Bessemer and Andreesen Horowitz therefore control

5   over 62% of the voting stock in Pinterest.

6       252.    For these reasons, demand is futile against Silbermann and Sharp. Given their

7   domination and control of Pinterest, including their huge stock holdings and financial

8   interest in the challenged conduct, Defendants Silbermann and Sharp are interested and

9   lack independence.  Thus, demand is futile as to them.

**B.  Demand Is Excused Because a Majority of the Director Defendants Is Either Not Independent or Is Conflicted Because the Directors Face a Substantial Likelihood of Liability Arising From Their Misconduct**

12      253.    Even if knowingly presiding over illegal conduct somehow falls within the

13  ambit of the business judgment rule (which it does not), demand is also futile and excused

14  because a majority of the members of the Board are not disinterested or independent and

15  cannot, therefore, properly consider any demand.

16      254.    Furthermore, Defendants Kilgore, Reynolds, and Wilson have all been

17  members of the Audit Committee during the relevant period, and are conflicted from

18  considering a demand because they each face a substantial likelihood of liability as a result

19  of their conduct on the committee.  As stated in the 2020 Proxy Statement, the Audit

20  Committee's charter imposes specific duties on members of this committee to, among other

21  things, review the Company's practices with respect to risk assessment and risk

22  management and meet with management and members of internal audit to discuss the

23  Company's significant risk exposures and the steps management has taken to monitor,

24  control and mitigate such exposures.

25      255.    In accordance with its charter, the Audit Committee also reviews the

26  Company's policies and practices with respect to gender and ethnic discrimination claims,

27  the financial reporting and control aspects of risk management, and must review the status

28

1    of risk oversight activities performed by the Board and its other committees.

2         256.    As members of the Audit Committee, Defendants Kilgore, Reynolds, and

3    Wilson violated their fiduciary duties to act in good faith to address the pervasive legal

4    violations discussed herein, including the unlawful pay equity gap and discrimination

5    against women and ethnic minorities with respect to hiring and promotion.  Accordingly,

6    Defendants Kilgore, Reynolds, and Wilson face a substantial likelihood of liability and

7    cannot impartially consider a demand.  Therefore, demand is excused with respect to these

8    defendants.

9         257.    Furthermore, the Director Defendants were on the Board during the relevant

10   period, and thus were exposed to and had knowledge of the "red flags" alleged herein

11   regarding unlawful discrimination and failure to abide by the Company's stated policies

12   against discrimination and retaliation. The directors' inaction in the face of red flags subjects

13   them to a substantial likelihood of liability for their conduct and, therefore, demand is

14   excused.

15        258.    The Board is likewise conflicted from and unable to pursue the Company's

16   claims against members of the Company's management.  Any effort to prosecute such

17   claims against these Defendants for their direct roles in implementing a business strategy

18   designed to ignore or otherwise circumvent federal and state laws prohibiting

19   discrimination would necessarily expose the Board's own culpability for the very same

20   conduct.  In other words, given that the Board had been on notice of the wrongdoing, any

21   effort by the Board to hold Defendants liable would surely lead these executives to defend

22   on the ground that their own conduct was consistent with the Company's corporate policy

23   and practice, as established by and known to the Board.

24        259.    Directors Jordan, Kilgore, Levine, Reynolds, Rajaram, Silbermann, and Wilson

25   breached their fiduciary duties to the Company by causing it to file a false and misleading

26   Proxy Statement with the SEC, in violation of Section 14(a) of the Exchange Act and Rule

27   14A-9.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

260.     Such directors approved the 2020 Proxy Statement filed with the SEC on April 9, 2020, which misled investors regarding Pinterest's compensation practices (particularly with respect to Brougher's compensation), oversight over those practices, and the true reason for Brougher's departure from Pinterest, in breach of their fiduciary duty of candor to the Company.

**C.    The Entire Board Faces a Substantial Likelihood of Liability for Failure to Discharge Their Oversight Obligations in Good Faith**

261.     Under Delaware law and the Company's Corporate Governance Principles, the Board, as the Company's highest decision-making body, is charged with ensuring that processes are in place for ensuring legal and regulatory compliance.  This is particularly true when such compliance concerns a core operation of the Company such as its employment practices and anti-discrimination and anti-harassment policies.  Here, the misconduct alleged was pervasive, took place over many years, and involved the Company's core business operations since the employment practices affected all Company operations. Organized and long-running violations of the law do not result from an isolated failure of oversight.   The entire Board was obligated to oversee the Company's risk, including potential liability for the Company's violations of federal and state laws regarding discrimination.  At the very least, the Director Defendants consciously turned a blind eye to these pervasive violations of law, creating a substantial likelihood of liability.  Accordingly, demand is excused.

262.     All the Board's directors, at the time this action was initiated, failed to act in the face of known duties. Indeed, as explained herein, they were presented with — but consciously ignored (and/or perpetuated) — substantial "red flag" warnings that the Company was discriminating against women and ethnic minorities with respect to hiring, promotion, and pay.  The Board also knew that the Company's workforce has consistently only had 1% or less African American in leadership positions.  The Board was also aware of other systematic discrimination at the Company against minorities, and has attempted to conceal the discrimination by failing to publish a minority Pay Equity Gap Report.

263.    These and other wrongful acts have caused and will continue to cause the Company to be subjected to significant potential fines and penalties and numerous lawsuits. They have also resulted in severe harm to the Company's business reputation.  Since the wrongdoing and harm alleged in this Complaint flows directly from the Board's conscious decision to permit the sustained and systemic violations of law in question, the Director Defendants are incapable of exercising the independent judgment required to determine whether the initiation of an action against the Defendants is appropriate.

**D.    Demand is Futile as to the Members of the Compensation Committee and Other Directors Who Approved Lower Compensation to Women**

264.    During the relevant time, the Company's Compensation Committee was comprised of Defendants Kilgore and Wilson.

265.    The members of the Committee were responsible for the evaluation of pay practices and the adoption and implementation of pay practices at Pinterest.  Defendants Kilgore and Wilson have breached their fiduciary duties as directors by failing to fulfill their duties as members of the Compensation Committee.  Rather than causing the Company to comply with its corporate governance principles and policies of pay equity and anti-discrimination, Kilgore and Wilson approved compensation policies that provided lower pay for women.

266.    Pinterest's Board (including Defendants Silbermann, Levine, Jordan, Wilson, and Reynolds) directly approved Brougher's compensation, and told Brougher that all executives receive equity grants which vest over time, meaning that the majority of an executive's shares do not vest within the first year.  Brougher's equity grants followed this structure, which she believed to be common to all Pinterest executives.

267.    However, in preparation for its IPO, Pinterest submitted company information in an S-1 to the SEC and Brougher learned for the first time in March 2019 that male peers had more favorable vesting schedules, with no or less backloading.  Specifically, Morgenfeld, Brougher's closest peer, received 812,500 shares in his first year, whereas Brougher received 300,000 shares — 63% fewer.

73

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

268. At the time of the IPO, Brougher's shares would have been valued at $5.7 million whereas, Morgenfeld's were valued at three times that amount — $15.4 million.

269. Moreover, Brougher's equity grant provided that only ten percent of the shares vested the first year; twenty percent vested the second year; thirty percent vested the third year; and forty percent vested the fourth year. By contrast, Morgenfeld's stock award had no backloading.

270. As these and other factors demonstrate, Defendants Kilgore, Wilson, Silbermann, Levine, Jordan, and Reynolds all directly participated in the wrongdoing alleged in this complaint under circumstances constituting bad faith and disloyal conduct. Such directors are therefore interested; demand is therefore excused as to them.

## IX.      CAUSES OF ACTION

### COUNT I
### Breach of Fiduciary Duty
### Against All Individual Defendants and Does 1–30

271. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

272. The Individual Defendants and Does 1–30 owed and owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

273. The Individual Defendants and Does 1–30, and each of them, as a result of the facts alleged herein, violated and breached their fiduciary duties of candor, good faith, and loyalty.

274. As a direct and proximate result of the Individual Defendants' and Does 1–30's breaches of their fiduciary obligations, the Company has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, defendants are liable to the Company.

/ / /

## COUNT II
### Aiding and Abetting Breach of Fiduciary Duty
### Against All Individual Defendants and Does 1–30

275.    Plaintiff incorporates by reference and realleges each of the preceding paragraphs as if fully set forth herein.

276.    Each of the Individual Defendants aided and abetted the other Individual Defendants in breaching their fiduciary duties owed to the Company.

277.    The Individual Defendants owed the Company certain fiduciary duties as fully set out herein.  By committing the acts alleged herein, the Individual Defendants breached their fiduciary duties owed to the Company.

278.    Each of the Individual Defendants colluded in or aided and abetted the other Individual Defendants' breaches of fiduciary duties, and actively and knowingly participated in the other Individual Defendants' breaches of fiduciary duties.  Each of the Individual Defendants knew about or recklessly disregarded the other Individual Defendants' breaches of fiduciary duty, which were and are continuing, as set forth in particularity herein.

279.    The Company was injured as a direct and proximate result of the aforementioned acts.

## COUNT III
### Abuse of Control
### Against Defendants Silbermann and Sharp

280.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

281.    By virtue of their positions and financial holdings at Pinterest, defendants Silbermann and Sharp exercised control over Pinterest and its operations, and owed duties as controlling persons to Pinterest not to use their positions of control for their own personal interests and contrary to Pinterest's interests.

282.    Defendants' conduct alleged herein constitutes an abuse of their ability to control and influence the Company, for which they are legally responsible.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

283.    As a result of defendants' abuse of control, the Company has sustained and will continue to sustain damages and injuries for which it has no adequate remedy at law.

## COUNT IV
### Unjust Enrichment
### Against All Individual Defendants and Does 1–30

284.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

285.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

286.    During the Relevant Period, the Individual Defendants either received annual stipends, bonuses, restricted stock units, or similar compensation from the Company that was tied to the financial performance of the Company or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

287.    Plaintiff, as shareholder and representative of the Company, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

288.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT V
### Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9
### Against All Individual Defendants

289.    Plaintiff incorporates by reference and realleges each allegation contained above, as though fully set forth herein, except to the extent those allegations plead knowing or reckless conduct by Defendants.  This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of Defendants.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

290.    SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

291.    Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders that were contained in the 2020 Proxy Statement.  The 2020 Proxy Statement contained proposals to the Company's stockholders urging them to reelect the members of the Board, approve say-on-pay executive pay packages, and reappoint E&Y as the Company's auditor.  The 2020 Proxy Statement was materially misleading for the reasons alleged herein.

292.    The Defendants knew of, but failed to disclose, fraudulent business practices at Pinterest that put the Company at material risk — namely, discriminatory hiring, promotion, and compensation practices. Had this information been disclosed, shareholders would not have voted to reelect Board members, approve executive compensation packages, and re-hire E&Y as the Company's auditor.

293.    By reasons of the conduct alleged herein, Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9. As a direct and proximate result of Defendants' wrongful conduct, the Company misled or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding the Company's recommendation to reelect the current Board, approve executive compensation, and re-hire E&Y.

294.    Plaintiff, on behalf of the Company, seeks injunctive and equitable relief because the conduct of the Individual Defendants interfered with Plaintiff's voting rights and choices at the 2020 annual meeting.  Plaintiff does not seek any monetary damages for

the proxy law violations.

295.    This action was timely commenced within three years of the date of the 2018 Proxy and within one year from the time Plaintiff discovered or reasonably could have discovered the facts on which this claim is based.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of the Company, requests judgment and relief as follows:

A.    Against all of the Defendants, jointly and severally, and in favor of the Company for the amount of damages sustained by the Company along with pre- and post-judgment interest as allowed by law resulting from Defendants' breaches of fiduciary duty, abuse of control, gross mismanagement, and violation of the federal proxy laws;

B.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

(1)    a proposal to require at least two current Directors to resign from the Board and replace such Directors with two Black persons;

(2)    a proposal to institute salary history bans in order to help eliminate the racial pay inequity at Pinterest;

(3)    all Director Defendants named in this suit should return all their 2020 compensation received from Pinterest (including any stock grants), and donate the money to an acceptable charity or organization whose efforts include the advancement of Black people and minorities in corporate America;

(4)    publication of an annual Diversity Report that contains more

78

particularized information regarding the hiring, advancement, promotion, and pay equity of all minorities at Pinterest;

(5)     creation of a $700 million fund to hire Black and minority employees, promote them to more management positions at the Company, establish and maintain a mentorship program at Pinterest for Black and minority employees that is committed to providing the skills and mentorship necessary to succeed in corporate America;

(6)     requirement of annual training of Pinterest's entire Board and all Section 16 executive officers, which training should at a minimum focus on diversity, affirmative action, anti-discrimination and anti-harassment, and other relevant topics;

(7)     immediately setting specific goals with respect to the number of Black and minority candidates to hire at the Company over the next five years, and Pinterest should adopt a revised executive compensation program that makes 30% of executives' compensation tied to the achievement of the diversity goals;

(8)     replacement of Ernst & Young LLP as its auditor.  Pinterest is one of E&Y's largest customers, and E&Y has served as Pinterest's auditor *since 2013*, giving rise to a cozy and clubby relationship between E&Y and Pinterest which is not conducive to effective auditing.  The Company's compliance with its stated policies concerning the commitment to diversity has been non-existent.  The very purpose of an auditor is to assess the Company's internal controls and determining if they are functioning effectively.  Rather than doing so, E&Y has wrongfully and consistently given Pinterest's internal controls a clean bill of health and has failed to point out the obvious — that Pinterest lacks an effective system of internal controls to ensure that the Company is not discriminating against minorities and is complying with its stated goals and initiatives regarding the promotion of diversity and the avoidance of discrimination and harassment;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

(8)     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater non-controlling shareholder input into the policies and guidelines of the Board;

(9)     a proposal to strengthen Pinterest's oversight of its procedures regarding the termination of employees, executives, and board members accused of discrimination;

(10)    a proposal to strengthen internal controls concerning discrimination;

(11)    a proposal to eliminate the use of Non-Disclosure Agreements at the Company so that current and former employees can report any and all instances of suspected discrimination without threat of legal action; and

(12)    a proposal to eliminate the use of mandatory arbitration for employee disputes and claims of wrongful termination and discrimination.

C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of Defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of Pinterest has an effective remedy;

D.     Awarding to Pinterest restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants;

E.     Awarding punitive damages at the maximum amount permitted by law;

F.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' fees, experts' fees, costs, and expenses; and

G.     Granting such other and further relief as the Court deems just and proper.

/ / /

/ / /

/ / /

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of Pinterest, hereby demands a trial by jury of all issues that are subject to adjudication by a trier of fact.

Dated:  December 29, 2020

Respectfully submitted,

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Anne Beste (SBN 326881)

_____
s/ Francis A. Bottini, Jr.
Francis A. Bottini, Jr.

7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:     (858) 914-2001
Facsimile:      (858) 914-2002
Email:          fbottini@bottinilaw.com
                achang@bottinilaw.com
                abeste@bottinilaw.com

*Attorneys for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

# VERIFICATION

I, Sal Toronto, verify that I am the custodian of the Elliemaria Toronto ESA, which is a shareholder of Pinterest Inc.  I have reviewed the allegations in this Verified Shareholder Derivative Complaint.  As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true.  Having received a copy of the complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on December __23__, 2020.

_Sal Toronto_
_____
Sal Toronto, Custodian of the
Elliemaria Toronto ESA

# EXHIBIT 1

# (THIS EXHIBIT IS SUBJECT TO A MOTION TO FILE UNDER SEAL)

# EXHIBIT 1

# EXHIBIT 2

# (THIS EXHIBIT IS SUBJECT TO A MOTION TO FILE UNDER SEAL)

**EXHIBIT 2**

# EXHIBIT 3

## (THIS EXHIBIT IS SUBJECT TO A MOTION TO FILE UNDER SEAL)

## EXHIBIT 3

# EXHIBIT 4

# (THIS EXHIBIT IS SUBJECT TO A MOTION TO FILE UNDER SEAL)

# EXHIBIT 4

# EXHIBIT 5

# (THIS EXHIBIT IS SUBJECT TO A MOTION TO FILE UNDER SEAL)

# EXHIBIT 5